**In re T. Kevin DOUGHERTY, Debtor.**

**CITIBANK (SOUTH DAKOTA), N.A., a national banking association, Plaintiff,**

v.

**T. Kevin DOUGHERTY, Defendant.**

**Bankruptcy No. 985–02344–7.
Adv. No. 986–0057.**

United States Bankruptcy Court,
E.D. California,
Modesto Division.

July 13, 1988.

Garry W. Solmonson, San Jose, Cal., for plaintiff.

T. Kevin Dougherty, pro per.

MEMORANDUM OF DECISION ON COMPLAINT TO DETERMINE DISCHARGEABILITY ON REMAND FROM BANKRUPTCY APPELLATE PANEL

JOSEPH W. HEDRICK, Jr.,
Bankruptcy Judge.

The complaint to determine dischargeability came on for trial on June 26, 1986. The Court issued its written memorandum of decision on September 30, 1986; an order finding the debt to be nondischargeable was filed on October 17, 1986. Debtor filed his notice of appeal on October 14, 1986.

On appeal, the Bankruptcy Appellate Panel was presented with two issues. The first dealt with the admissibility of credit card statements. In its opinion filed February 5, 1988,[1] the BAP affirmed the trial court decision that the monthly credit card statements had been properly authenticated and thus there was no error in admitting them.

The second issue before the BAP was whether the trial court had erred in determining that the credit card debts were non-dischargeable. The BAP acknowledged the split in authority that has developed in this area. Declining to adopt either the majority view of "implied representation" or the minority "assumption of the risk" theory, the BAP instead chose to adopt a middle position articulated by Judge Lindquist in *In re Faulk*, 69 B.R. 743 (Bankr.N. D.Ind.1986). As the BAP noted, the *Faulk* approach is essentially a modified version of the assumption of the risk theory. The BAP then vacated our prior decision and remanded the case for consideration under the *Faulk* analysis.

Under *Faulk*, credit card purchases made after the revocation of the card are non-dischargeable. Charges made prior to revocation are non-dischargeable only if the card issuer proves by clear and convincing evidence that actual fraud occurred in that the debtor made the charges with no intention of later paying for them. The court set forth a non-exclusive list of factors that should be considered in determining if actual fraud occurred:

1. The length of time between the charges made and the filing of bankruptcy;
2. Whether or not an attorney has been consulted concerning the filing of bankruptcy before the charges were made;
3. The number of charges made;
4. The amount of the charges;
5. The financial condition of the debtor at the time the charges are made;
6. Whether the charges were above the credit limit of the account;

---

1. *In re Dougherty,* 84 B.R. 653, 18 C.B.C.2d 471, 17 B.C.D. 590 (9th Cir. BAP 1988).

7. Did the debtor make multiple charges on the same day;

8. Whether or not the debtor was employed;

9. The debtor's prospects for employment;

10. Financial sophistication of the debtor;

11. Whether there was a sudden change in the debtor's buying habits; and

12. Whether the purchases were made for luxuries or necessities.

*Id.* at 757 (citing *In re Carpenter,* 53 B.R. 724, 725, 730 (Bankr.N.D.Ga.1985).

In reviewing the evidence presented at trial under the standard set forth in *Faulk* and now adopted by the BAP, the court finds that the plaintiff has proven by clear and convincing evidence that the debtor committed actual fraud by making credit card purchases with no intention of later paying for them. Going through the *Faulk* checklist, it is clear that plaintiff has established each factor:

1. Sometime in March 1985, the plaintiff sent material to the debtor inviting him to apply for a Citibank Visa card. The debtor completed the "Pre–Approved Acceptance Certificate" and signed and dated it on March 26, 1985.[2] The debtor began making purchases on the card sometime in May 1985. Between May and December of that year, the debtor made charges exceeding $4,000.00 on the Visa card. Of that amount, approximately $515.39 was later "charged back" by the plaintiff. Debtor made only three payments on the account, for a total of $81.00.

The charges which plaintiff seeks to have declared non-dischargeable appeared on statements dated September 20, 1985 and later. Thus, these purchases were made in August through November of 1985, only one to four months before the debtor filed his bankruptcy petition.[3]

2. The debtor testified at trial that he had not consulted an attorney about filing the bankruptcy. He further stated that he had filled out his forms by himself. The court finds this impossible to believe considering the circumstances. During his deposition, the debtor stated that he had begun employment as a law clerk with a local law firm in August. Members of that law firm practice bankruptcy law and appear frequently in this very court. The court does not believe that the debtor didn't confer with one of the attorneys concerning the possibility of filing bankruptcy and the effects of such a filing.

Moreover, debtor himself made an oral request at trial to have his attorneys fees paid. He presented to the court a bill for $600.00, which was purportedly a bill for advice and consultation prior to filing an answer to the complaint, giving the deposition and preparing a trial brief. Given the fact that the debtor readily admits that he consulted an attorney after the petition was filed and that he began working for attorneys who practice in the bankruptcy courts prior to filing bankruptcy and at about the same time he began to make excessive charges on his Visa card, it is unlikely that he did not consult an attorney about the effects of bankruptcy at about the time he made the charges.

3. The number of charges on the card increased dramatically beginning in August. The statements dated May 21, June 20, July 22 and August 21 show four, four, two and eight charges respectively. The statement dated September 20, reflecting August's activity, shows twenty-one charges. The October 22 statement shows sixty charges. It is obvious that after Au-

---

2. Plaintiff's Exhibit 2.

3. *See, e.g., In re Vegh,* 14 B.R. 345 (Bankr.S.D. Fla.1981) (held non-dischargeable a credit card debt incurred within one month of filing for relief); *In re Schnore,* 13 B.R. 249 (Bankr.W.D. Wis.1981) (held nondischargeable credit card debt of $3,467.54 incurred in a two month shopping spree by debtor); *In re Poteet,* 12 B.R. 565 (Bankr.N.D.Tex.1981) (credit card debt incurred within one and one-half months of filing held nondischargeable); *In re Pitts,* 10 B.R. 557 (Bankr.M.D.Fla.1981) (held nondischargeable credit card debt of $3,808.14 incurred after debtor lost his job and within two months of filing for relief); *In re Wright,* 8 B.R. 625 (Bankr.S.D. Ohio 1981) (held nondischargeable credit card debt of $1,509.17 incurred within three months of filing for relief.)

gust the debtor's use of the credit card rose dramatically.

4. The amount of charges, coupled with the number of charges, establishes a pattern of spending that demonstrates the requisite intent and purpose to deceive the plaintiff. Numerous small charges indicate that the debtor was trying to avoid having merchants call to verify the charges. The credit statements show that during the period from August 15, 1985 through December 2, 1985, the debtor made 117 separate purchases of merchandise on the Visa card issued by the plaintiff. Only three of these purchases exceeded $50.00.

The debtor frequently spread purchases from the same store over a number of separate charges. For instance, on September 17, 1985, debtor charged $18.92 at Alpine West, a clothing and sporting goods store. The next day, he made two separate charges of $19.61 and $18.29 for a two-day total of $56.82. This pattern of separate small charges spread over one or two days occurred frequently. On September 17, 1985, debtor made two separate charges of $23.65 and $15.90 at Long's Drug Store No. 109. The next day, September 18, the debtor made two more purchases of $18.54 and $26.02. The next day, September 19, debtor again went to that same store and made another purchase of $18.33. His three-day, five draft total was $102.44.

In another instance, the debtor made three purchases of $49.49, $41.90 and $35.00 at Alpine West on September 24, 1985. Any two of those purchases together would probably have been enough to trigger a credit check. His total for the day was $126.39. He returned to Alpine West the next day, September 25, and made another $35.00 purchase, and returned yet again on September 26 and made a $40.77 purchase. The three-day, five draft total was $202.16.

The instances of the debtor splitting his purchases over one or two days and among small drafts are too numerous to go into at length. They are more properly relegated to a footnote.[4] The overwhelming pattern of the debtor's spending leads the court to conclude that the debtor was trying to conceal from the plaintiff the fact that the charges were being made.

5. The debtor initially testified that his financial problems began when a bonus at work fell through in November 1985. He later testified that his problems began sometime after September 1985. However, his deposition testimony indicated that he contacted several of his creditors *over the summer* to ask for time extensions. He stated that "the first couple of times they were fairly receptive. Then they got a little bit uptight."[5]

Despite his financial problems which resulted in asking for time extensions of his repayments during the summer and early fall, the debtor went on a spending spree. His purchases in August 1985 totaled approximately $276.90, in September approximately $1,208.04, and in October approximately $1,443.06.

6. The debtor knew or should have known that his credit limit was $1,500 because it was stated very clearly on the "Pre–Approved Acceptance Certificate" which he signed and completed. Moreover, his credit limit was stated on every Visa statement he received. In addition, the September 20 statement and statements thereafter included notices at the end of the account activity that indicated the debtor was over his credit limit.

The August 21, 1985 statement indicated a balance of $1,419.03. Yet with less than $81.00 of credit remaining, the debtor went on a spending spree. The next statement, dated September 20, 1985, shows 21 purchases totalling $500.03. These purchases

---

**4.** On September 25, purchases of $29.83 and $29.31 at Meadow's Camera Shop. On September 30, purchases of $24.97 and $40.00 at Alpine West. More purchases at Alpine West of $47.70 on October 9, $47.70 on October 10, $40.28 and $45.86 on October 11, and $47.70 on October 12. Two separate purchases of $47.70 each on October 10 at the Parts House. Two purchases of $37.58 and $33.00 at Alpine West on October 17 and 18, respectively. At Firestone Stores, two separate purchases of $40.23 each on October 22 and 23.

**5.** Plaintiff's Exhibit 3, Transcript of Deposition, page 25.

put the debtor over his credit limit. Since he made no payments on the account after August,[6] he never went below his credit line for the remainder of the time he held the card. By the final statement, dated December 19, 1985, the debtor was $2,594.75 over his credit limit.

7. The question of whether the debtor made multiple charges on the same day has already been discussed. It is sufficient to merely reiterate that the debtor's spending pattern of making numerous small charges at the same store over a period of one or two days indicates an intent to conceal from the plaintiff the fact that the charges were being made.

8. At trial, the debtor testified that he had worked for one law firm during the Spring of 1985. Sometime in late spring or early summer, he was laid off from that job. He was unemployed for part of the summer. He testified that he found employment with another law firm in August–September 1985.

Debtor indicated that his income at the first law firm had been approximately $2,000. His salary at the new law firm was $6.50 per hour along with the possibility of "substantial" bonus, to be received at the conclusion of the case that he was hired to work on. When questioned about the bonus, the debtor admitted that no dollar amount was ever indicated and that he had nothing in writing pertaining to the bonus.

The debtor asserted that when the case he was working on was removed from state court to federal court, his bonus fell through. He could no longer meet his obligations and filed for bankruptcy. The debtor was unable to adequately answer the plaintiff's question as to why a change of venue from state court to federal court would result in forfeiture of a bonus.

The plaintiff argued that the debtor's reliance on this "bonus," without anything in writing or any understanding or indication of the amount of the bonus was unreasonable. The court agrees that such reliance was, in fact, unreasonable. Relying

on a bonus, in an uncertain amount and which may never materialize, to pay credit card bills is unreasonable. Moreover, as already discussed, debtor's deposition testimony indicated that his financial woes began much earlier and that he was negotiating with at least some of his creditors in the summer and early fall.

9. There was no evidence introduced at trial relating to the debtor's prospects for employment, other than the testimony noted previously.

10. Testimony relating to the debtor's financial sophistication was ambiguous. The debtor testified that his ex-wife was handling some or all of his bills during part of the period in question. He thus disavowed all knowledge of any payments made on the account. The court notes however, that the debtor was at the time in question a college graduate and a student at a local law school. This would appear to indicate at least an average level of intelligence and financial sophistication.

11. The sudden change in the debtor's spending habits has already been noted. The account was relatively dormant until August 1985; generally between two and eight charges were made each month. In August, however, twenty-one charges were made. In September, approximately sixty charges were made. This coincided with the time that debtor was experiencing financial difficulties as shown by his deposition testimony.

12. The evidence as to whether the purchases were made for luxuries or necessities was ambiguous. The testimony indicated that Alpine West is a clothing and sports store. Although the debtor made numerous charges at the store, there is no evidence to indicate specifically which charges were for clothing and which charges were for sporting goods, which the court notes is not generally considered a necessity. Nor in considering the numerous charges made at Meadows Camera Shops, can the court believe that camera

---

6. The debtor made three payments on the account: $30.00 and $20.00 reflected on the July 22 statement and $31.00 reflected on the August

21 statement. Thus, debtor only made payments of $81.00 on an account totaling over $4,000.00.

supplies are a necessity. Additionally, there was some testimony during the debtor's deposition as to charges for plane tickets, tuition, books, and for investments. However, in view of the ambiguity in the evidence and testimony, the court is unable to make a finding as to what percentage of the debtor's charges was for necessities and what percentage was for luxuries.

Although the plaintiff has a heavy burden of proof in non-dischargeability cases, it is clear that the plaintiff has met that burden of proof. Reviewing the evidence in conjunction with the standard set by *Faulk* and adopted by the BAP, this court finds that the debtor made charges with no intention of paying for them. Accordingly, we hold that the debtor's debt to plaintiff is non-dischargeable in the amount of $2,675.00. The remainder of the debt, approximately $1,450.00 is discharged.

Counsel for plaintiff is directed to prepare proposed Findings of Fact and Conclusions of Law and a proposed Judgment consistent with this decision. The proposed Findings of Fact and Conclusions of Law may incorporate this decision by reference and may include such additional findings and conclusions as are necessary, proper, and supported by the evidence to an extent not inconsistent with this decision. The proposed Judgment and Findings of Fact and Conclusions of Law shall be served on all opposing counsel and a copy of each shall be lodged with the court with a proof of such service. If no written objections are filed with the court on or before the later of five days after service on opposing counsel or five days after lodgment with the court, the Judgment and Findings of Fact and Conclusions of Law may be signed, filed, and entered herein.