**In re William Joseph CIRINEO and Heidi J. Cirineo, a/k/a Heidi Weinberg, Debtors.**

**MANUFACTURERS HANOVER TRUST COMPANY, Plaintiff,**

v.

**Heidi J. CIRINEO a/k/a Heidi Weinberg, Defendant.**

**Bankruptcy No. 89–12964S.**
**Adv. No. 89–1168S.**

United States Bankruptcy Court, E.D. Pennsylvania.

Feb. 22, 1990.

Noah Gorson, Gorson & Gorson, P.C., Philadelphia, Pa., for plaintiff.

Arthur P. Liebersohn, Philadelphia, Pa., trustee.

Matthew H. Krekstein, Schwartz & Krekstein, Philadelphia, Pa., for debtors.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The instant proceeding requires us to address the issue of dischargeability of a large (over $5,000) indebtedness accumulated by a debtor on the account of an unsolicited but accepted credit card in a very short period (16 days). We hold that, only if the lack of intention of the debtor to repay is

proven by clear and convincing evidence or indebtednesses were accumulated after the debtor knew or should have known that the limit of the credit line was exceeded are debts on such a credit card non-dischargeable.

Applied to the instant facts, we find a lack of proof of an intention of the Wife–Debtor not to repay the indebtedness in issue in light of the efforts of her and her husband to obtain an equity loan to repay their credit-card debt before consulting bankruptcy counsel to file their instant bankruptcy case. We also find that only a $23.72 purchase was made after the Wife–Debtor knew or should have known that her credit-line was exhausted. Therefore, only $23.72 of the debt in issue is determined to be non-dischargeable.

## B. PROCEDURAL HISTORY

The Debtors, WILLIAM JOSEPH CIRINEO (hereinafter "the Husband") and HEIDI J. CIRINEO (hereinafter "the Wife") (collectively the Husband and the Wife shall be referred to as "the Debtors"), filed a joint voluntary Chapter 7 bankruptcy case on August 11, 1989. The only matter of consequence filed in the case to date has been the instant adversary proceeding, filed on December 19, 1989, by MANUFACTURERS HANOVER TRUST CO. (hereinafter "the Plaintiff), against the Wife only.

The matter was listed for trial on February 6, 1990. The Plaintiff appeared with a witness from Long Island, New York. The Husband appeared and stated that the Wife was presently hospitalized and unavailable until the following week. We gave the Plaintiff the option of returning to try the entire matter in the next week or commencing its case with the understanding that the Wife would be available in a supplement to the trial in the next week. The Plaintiff chose to proceed by calling its witness, Anthony Galluzzi (hereinafter "Galluzzi"), and, to the surprise of the Debtors and their counsel, the Husband, as its own witness.

At the conclusion of the testimony on February 6, 1990, the Debtors moved for an involuntary dismissal of the proceeding pursuant to Bankruptcy Rule (hereinafter "B.Rule") 7041 and Federal Rule of Civil Procedure (hereinafter "F.R.Civ.P.") 41(b). *See In re Fitzgerald,* 73 B.R. 923, 924 (Bankr.E.D.Pa.1987). The motion was denied. The matter was relisted on February 15, 1990, at which time the Wife testified. The Plaintiff's opportunity to call the Husband by complete surprise and then the Wife separately, resulted, we think, in an unusually good opportunity for the court to assess the Debtors' credibility. The dictates of B.Rule 7052 and F.R.Civ.P. 52(a) mandate that we deliver our decision in the form of Findings of Fact and Conclusions of Law. The latter will include discussions of relevant authorities.

## C. FINDINGS OF FACT

1. In early May, 1989, the Plaintiff sent an unsolicited offer to the Wife to obtain a credit line of $5,000 on "Grand Elite Gold MasterCard." The Wife was only obliged to sign the application form to receive the card, which she did.

2. The Wife had been unemployed since she bore the Debtors' child in December, 1988, and, due to her loss of employment and the lingering effects of an injury to the Husband, the Debtors' income had been reduced and they had become in arrears on their mortgage and other charge accounts at the time that the Plaintiff's offer was received. The Wife, without advising the Husband, accepted the Plaintiff's offer.

3. Galluzzi testified that the Plaintiff "hires an organization" to investigate the records of payments of persons to whom it sends solicitations for its cards, which he believed entailed a "stringent" check of credit reports. It is apparent to the court, however, that, due to the fact that such data may be inconclusive or obsolete and that no questions regarding the prospective cardholder's present status are asked, the Plaintiff's means for investigating prospective cardholders is superficial, and the Plaintiff is willing to take considerable risks to receive the perceived benefit of obtaining a large number of users of its card.

4. The Wife, without the knowledge of the Husband, began using the card shortly after its arrival on June 7, 1989. She made not only numerous small purchases of apparently, medications, clothes, and toys for the Debtors' baby, but also used the card for cash advances totalling $4,650 between June 7, 1989, and June 23, 1989. These sums were used, at least in part, to cure arrearages on the Debtors' mortgage.

5. A statement of the account issued on July 13, 1989, recited the balance due on the account as $5,295.85. The use of the card which raised the balance over the $5,000 credit-line limit was an $800 cash advance, which Galluzzi testified should have been approved by the Plaintiff before it was permitted. After July 13, 1989, the Wife's only use of the card was to make a $23.72 purchase on July 18, 1989.

6. The Plaintiff's statements first contained the recitation that the Wife's account was cancelled on the statement of September 13, 1989. The balance due had at that time risen to $5,477.50, including post-petition finance charges.

7. The Wife testified that she intended to repay the sums advanced to her by the Plaintiff. The Debtors both testified that they had applied for home-equity loans with several lending institutions, in June, 1989, for, *inter alia*, this purpose.

8. The Debtors both testified that their aforesaid applications for home-equity loans were not rejected until July, 1989, and the Wife produced a letter from Core-States Bank, dated July 5, 1989, which rejected an application with that lending institution on that date.

9. The Debtors both testified that they did not contemplate bankruptcy nor contact counsel to do so until late July, 1989, after their applications for home-equity loans were rejected.

10. Although the Wife was a hesitant witness, reflecting a sense of embarrassment and extreme nervousness, her testimony was not inconsistent with that of the Husband, who was quite forthright when called as a surprise witness at the hearing of February 6, 1990, and was supported in part by documentation. We therefore find credible the Wife's claim that she intended to repay all of the charges made on the Plaintiff's charge card. However, we find that she knew or clearly had reason to know that the final $23.72 charge was in excess of her credit-line limit.

## D. CONCLUSIONS OF LAW/DISCUSSION

1. AS IN ANY PROCEEDING BASED UPON 11 U.S.C. § 523(a)(2)(A), THE PLAINTIFF WAS OBLIGED TO PROVE, BY CLEAR AND CONVINCING EVIDENCE, THAT ALL FIVE CONSTITUENT ELEMENTS ARE PRESENT.

The Plaintiff's cause of action is based solely upon 11 U.S.C. § 523(a)(2)(A), which provides as follows:

§ 523. Exceptions to discharge

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

.    .    .    .    .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; ...

It is well-established that

in order to succeed in a claim under § 523(a)(2)(A), the Plaintiffs were obliged to

"establish all of the following elements by the demanding standard of 'clear and convincing evidence:'

(1) that the debtor made the representation;

(2) that at the time he knew they were false;

(3) that he made them with the intention and purpose of deceiving the creditor;

(4) that the creditor relief [relied] on such representations;

(5) that the creditor sustained the alleged loss and damages as a proxi-

mate result of the representations having been made."

*In re Bergman,* 103 B.R. 660, 671 (Bankr. E.D.Pa.1989), quoting *In re Stelweck,* 86 B.R. 833, 846 (Bankr.E.D.Pa.1988), *aff'd, sub nom. United States v. Stelweck,* 108 B.R. 488 (E.D.Pa.1989); and *Fitzgerald, supra,* 73 B.R. at 926. *See also In re Woods,* 66 B.R. 984, 988 (Bankr.E.D.Pa. 1986); *In re Gelfand,* 47 B.R. 876, 879 (Bankr.E.D.Pa.1985); and *In re Brackin,* 23 B.R. 984, 985 (Bankr.E.D.Pa.1982).

Analyzing whether each of the above-referenced five elements have been proven by "clear and convincing evidence" is the basis for resolution of any § 523(a)(2)(A) proceeding, including proceedings involving a debtor's misuse of credit cards.

### 2. WE AGREE WITH THE GENERALLY–HELD PRINCIPLE THAT USE OF A CREDIT CARD CONSTITUTES A REPRESENTATION THAT THE USER WILL PAY FOR THE CHARGES MADE ON A CREDIT CARD.

■ The first three of the five elements which the creditor must establish in order to prevail in a proceeding brought under § 523(a)(2)(A) focus on the conduct of the debtor.

As the Plaintiff here argues, it is well-established, in this jurisdiction and elsewhere, that a debtor's use of a credit card is a representation that the debtor will pay for purchases made through use of the card when billed for same. *See In re Lipsey,* 41 B.R. 255, 257 (Bankr.E.D.Pa.1984); *In re Petrini,* 23 B.R. 981, 982–83 (Bankr.E.D. Pa.1982); and *In re Ciavarelli,* 16 B.R. 369, 370 (Bankr.E.D.Pa.1982). *Accord, e.g., In re Schmidt,* 36 B.R. 459, 460 (E.D. Mo.1983); *In re Stewart,* 91 B.R. 489, 494 (Bankr.S.D.Iowa 1988); *In re Deloian,* 60 B.R. 161, 163 (Bankr.N.D.Ill.1986); and *In re Aversa,* No. 77B 3296, slip op. at 8 (Bankr.E.D.N.Y. January 10, 1979).

We agree with the reasoning of these courts on this issue. Therefore, the first of the five § 523(a)(2)(A) elements is rather easily made out, and is established on the present record.

### 3. WE ARE UNABLE TO TOTALLY AGREE WITH THOSE COURTS THAT HAVE RELIED UPON OBJECTIVE TESTS TO ESTABLISH THE REMAINING ELEMENTS OF (1) THE CARD USER'S SUBJECTIVE KNOWLEDGE OF AN INABILITY TO PAY THE SUM CHARGED AND (2) THE USER'S INTENTION AND PURPOSE TO DEFRAUD THE CREDIT–CARD ISSUER.

■ However, proving the existence of the other debtor-related elements, *i.e.,* that the credit-card user *knew* that the representations were false and that they were made with the *intention* and *purpose* of deceiving the issuer of the credit-card, is not so easy. Several courts have approached the problem of proof of the requisite subjective elements by studying a number of presumably-objective "factors." If most or all of these factors are found present, then the debtor's knowledge of the inaccuracy of the representation to pay a credit-card debt and the intention of the debtor to deceive the creditor are inferred. The following six factors have been recited by this court in *Lipsey,* 41 B.R. at 258; *Brackin, supra,* 23 B.R. at 985; *Petrini, supra,* 23 B.R. at 983; and *Ciavarelli,* 16 B.R. at 370–71, and by other courts, *e.g., Schmidt, supra,* 36 B.R. at 460; *In re Williams,* 85 B.R. 494, 499 (Bankr.N.D.Ill. 1988); *Deloian, supra,* 60 B.R. at 163; *In re Holston,* 47 B.R. 103, 108 (Bankr.M.D. La.1985); and *In re Griffis,* 29 B.R. 110, 112 (Bankr.D.Vt.1983):

1. the length of time between the charges made and the filing of bankruptcy;

2. whether or not an attorney has been consulted concerning the filing of bankruptcy before the charges are made;

3. the number of charges made;

4. the amount of charges;

5. the financial condition of the debtor at the time the charges are made; and

6. whether the charges were above the credit limit of the account.

Several other courts, not content with this list, have appended the following six factors in addition:

7. Did the debtor make multiple charges on the same day;

8. Whether or not the debtor was employed;

9. The debtor's prospects for employment;

10. Financial sophistication of the debtor;

11. Whether there was a sudden change in the debtor's buying habits; and

12. Whether the purchases were made for luxuries or necessities.

*See In re Dougherty,* 89 B.R. 840, 841–42 (Bankr.E.D.Cal.1988); *In re Faulk,* 69 B.R. 743, 757 (Bankr.N.D.Ind.1986); *In re Blackburn,* 68 B.R. 870, 877 (Bankr.N.D. Ind.1987); and *In re Carpenter,* 53 B.R. 724, 729 (Bankr.N.D.Ga.1985).

As we indicate at page 762 *infra,* we are respectfully unable to totally agree with the attempts of these courts to measure subjective elements through objective criteria. The elements of § 523(a)(2)(A) require a finding that, *subjectively,* the card user knew that (s)he was unable to fulfill the representation that the user would pay for the credit charged at the time that it was used and that the user nevertheless used the card with the intention of not paying the creditor. We agree that the foregoing six or twelve factors may all be useful for a court to consider in determining whether the user's subjective intent was or was not to repay at the time of use of the card. However, we do not believe that the presence of a predominant number of these elements or even all of them should create a conclusive presumption or even a presumption that the user is a willful cheat.

We shall therefore leave further discussion of the second and third elements necessary to be established to succeed in a matter under § 523(a)(2)(A) for the present and pass to the fourth and fifth elements, which focus upon the conduct of the creditor rather than the debtor.

4. SEVERAL COURTS HAVE CONCLUDED THAT ONLY CREDIT-CARD DEBTS ARISING AFTER A CREDIT CARD IS REVOKED OR ITS LIMIT IS EXCEEDED ARE NONDISCHARGEABLE UNDER § 523(a)(2)(A).

In *Davison–Paxon Co. v. Caldwell,* 115 F.2d 189, 190–02 (5th Cir.1940), *cert. denied,* 313 U.S. 564, 61 S.Ct. 841, 85 L.Ed. 1523 (1941), the court approached the dischargeability of credit-card debts differently than any of the judges in this jurisdiction. The court held that the granting of credit-card privileges is an offer of credit which, if accepted by the card user without "misrepresentation, artifice, or trick," *id.* at 192, is dischargeable. The insolvency of and/or the lack of intention of the user to pay the debt charged, even if admittedly not constituting "straightforward and honest" conduct on the part of the debtor, *id.* at 191, was found insufficient to give rise to non-dischargeability. The holding therefore suggest that the presence of all of the six or twelve factors recited above would be immaterial, and dischargeability would result unless the user engaged in gross fraud, like possibly misrepresenting his or her identity in obtaining or using the card.

The *Davison–Paxon* decision, though never overruled, was not approved nor avidly followed until the decision in *First National Bank of Mobile v. Roddenberry,* 701 F.2d 927 (11th Cir.1983). In *Roddenberry, Davison–Paxon* was given new life by the application of its analysis to the modern phenomenon of an economy increasingly dependent on the use of credit cards. Implicitly placing the responsibility for widespread consumer over-extension on credit-card issuers who made credit too easy, the court thus appraised *Roddenberry,* 701 F.2d at 930:

Davison–Paxon has been subject to severe criticism because it is understood to reward a debtor's fraudulent concealment of insolvency. A closer examination of the decision, however, reveals that by discharging Caldwell's debts, the court did not intend to reward deceitful non-disclosure. Instead, it sought to deny a particularly improvident creditor

the special privilege of an exemption from a general discharge. Although the court acknowledged that Caldwell "did not act in a straight-forward and honest way in not making full disclosure of her financial condition ...," it went on to stress that the Bankruptcy Act was remedial statute for the benefit of debtors and that exemptions to discharge therefore should be construed narrowly. 115 F.2d at 191.

Ultimately, the court concluded as follows, *id.* at 932:

The element of risk is inherent in the issuance of bank credit cards. Our "credit-card economy" encourages widespread voluntary risk-taking on the part of those issuing cards. Once credit cards are issued (if not fraudulently obtained), the bank has agreed to trust the cardholder and to extend credit, and once credit is extended, the bank must decide when and if credit will be revoked. It is not the function of courts to determine when a bank ought to revoke credit. It also is of little consequence that the bank can show that the terms and conditions said to apply to use of the card have been violated. The mere breach of credit conditions is of minimum probative value on the issue of fraud because banks often encourage or willingly suffer credit extensions beyond contractual credit limits. Indeed, banks have a definite interest in permitting charges beyond established credit limits because of the high finance charges typical in such transactions. *In re Talbot,* 16 B.R. 50, 52 (Bankr.M.D.La. 1981). Banks are willing to risk non-payment of debts because that risk is factored into the finance charges. Because the risk is voluntary and calculated, section 17(a)(2) [of the predecessor Bankruptcy Act] should not be construed to afford additional protection for those who unwisely permit or encourage debtors to exceed their credit limits.

Bearing in mind these considerations, we hold that the voluntary assumption of risk on the part of a bank continues until it is clearly shown that the bank unequivocally and unconditionally revoked the right of the cardholder to further possession and use of the card, and until the cardholder is aware of this revocation....

The *Roddenberry* court proceeded to conclude that the debtors' credit-card balance of over $5,200, accumulated on an account with a $1,000 credit limit, was non-dischargeable only insofar as charges were made after revocation of the cards was communicated to the debtors. *Id.* at 928–29, 933.

*Roddenberry* has been expressly followed by several courts which were not bound to its holding. *See Comerica Bank–Midwest v. Kouloumbris,* 69 B.R. 229, 230–31 (N.D.Ill.1986) (debtor ran up debts of about $4,950 on pre-approved credit line of $5,000 in about three months; discharge granted despite that evidence of debtors' intention to repay was found "equivocal"); and *In re Shrader,* 55 B.R. 608, 611–12 (Bankr.W.D.Va.1985) (debts discharged, although court also finds that debtors intended to pay relatively modest balance). *Roddenberry's* reasoning has been accepted by several courts with certain modifications. One is that the crucial period when nondischargeability should attach should be when the debtor knows that the credit limit has been exceeded as opposed to when revocation is communicated to the debtor. *See Faulk, supra,* 69 B.R. at 756. Another is that a showing of an intent of the debtor not to repay should also result in nondischargeability. *See Carpenter, supra,* 53 B.R. at 731–32; and *In re Wilson,* 32 B.R. 772, 776–77 (Bankr. E.D.Tenn.1983).

As we indicate at pages 761–62 *infra,* we also accept the general reasoning of *Roddenberry* that credit-card issuers assume a degree of risk, but we believe that certain revisions to its conclusions similar to those suggested by *Faulk, Carpenter,* and *Wilson,* are also appropriate. Therefore, the proof of the fourth and fifth elements to establish liability under § 523(a)(2)(A)—creditor reliance on the debtor's actions and that the creditor's losses are solely the result of the debtor's acts as opposed to its own—are problematical

for the credit-card issuer in dischargeability litigation.

5. SEVERAL COURTS HAVE INDICATED A PARTICULAR UNWILLINGNESS TO MAKE A FINDING OF JUSTIFIED CREDITOR RELIANCE UPON PAYMENT BY DEBTORS WHO ARE RECIPIENTS OF UNSOLICITED CREDIT CARDS.

In *In re Ward*, 857 F.2d 1082 (6th Cir. 1988), the court addressed a dischargeability complaint filed by the instant Plaintiff concerning an indebtedness of $2,200 accumulated in a 23–day period after the debtor received a credit card offering him a $2,000 credit line. The debtor had been previously convicted of embezzlement of $250,000 and the court apparently assumed that the debtor had no intention to repay. *Id.* at 1082–83. The court nevertheless concluded that the Plaintiff's minimal credit investigation of the debtor constituted "negligent reliance" upon the debtor's application which caused the Plaintiff to "assume the risk" of the debtor's default on charges until the time that the care was revoked, *id.* at 1058, and which in turn resulted in discharge of all of the debtor's obligations to the Plaintiff.

Other courts, though troubled by the loose creditor-approval practices of the instant Plaintiff, *In re Doggett*, 75 B.R. 789, 791–92 (Bankr.S.D.Ohio 1987), and other banks that issue similar credit cards, *In re Robinson*, 55 B.R. 839, 845–48 (Bankr.S.D. Ind.1985), have discharged only obligations within the amount of the credit-line which was approved. The court, in *Wilson, supra*, 32 B.R. at 775–76, declines to allow a discharge to a debtor whom it found used an unsolicited credit card without an intention to pay. One court ruled in favor of a debtor who had received an unsolicited credit card without discussing the particular "reliance" issues raised by use of such a card. *In re Davis*, 42 B.R. 611 (Bankr.E. D.Va.1984). Finally, one case, involving the Plaintiff here, held that the debtors' immediate use of an unsolicited card for charges well in excess of their income was

nondischargeable. *In re Sterling*, 67 B.R. 294 (Bankr.D.R.I.1986).

Most, but not all, courts have, then, concluded that the elements of creditor reliance and proximate cause are weakened in the instance of a creditor's issuance of an unsolicited credit card which the debtor proceeds to use. We are now prepared to develop our own principles in light of the foregoing legal landscape and then proceed to apply these principles to the case at bar.

6. THE DEBT OF A RECIPIENT OF AN UNSOLICITED CREDIT CARD SHOULD BE NONDISCHARGEABLE ONLY IF (1) THE CARD IS USED TO MAKE CHARGES WHICH THE USER KNOWS OR SHOULD KNOW ARE IN EXCESS OF THE CREDIT LIMIT GRANTED; OR (2) THE SUBJECTIVE INTENT OF THE USER TO NOT PAY THE CHARGE MADE IS OTHERWISE ESTABLISHED.

■ We believe that the observations of the *Davison–Paxon, Roddenberry,* and *Ward* courts are, for the most part, accurate. The presence of credit which is too easy and too tempting for those in need to resist is, in our experience, the cause of over-extension of credit which is in turn a cause of a significant number of consumer bankruptcies. Creditor-reliance and the fact that such reliance must be the proximate cause of the creditor's losses are two of the elements which any creditor asserting a cause of action under § 523(a)(2)(A) must establish by the demanding "clear and convincing evidence" standard. The reasonability of the creditor's reliance is diminished in the setting in which it issues a credit card and is diminished further still if it forwards an unsolicited credit card to a prospective user.

■ Nevertheless, we are unwilling to accept the *Ward* court's implicit conclusion that the dispatch of an unsolicited credit card is a treasure trove for even the most venal debtor. We therefore agree with those courts that set some limits on the extent of the dischargeability, even in the unsolicited-credit-card context.

Particularly, we agree with the courts, which include those that decided the *Faulk, Carpenter, Doggett,* and *Robinson,* cases, that the debtor's exhaustion of the credit line is more significant than the actual revocation of the card, which was held to be the line of demarcation for nondischargeability in *Roddenberry.* We also cannot accept the reasoning of *Ward,* which would not impose *any* limits on the debtor's use of the credit in determining dischargeability.

The creditor is only exposing itself to liability to the extent of the credit line approved. As the facts of the instant case and many of these other cases reveal, debtors are capable of running up large debts before credit-card issuers can reasonably be expected to take steps to actually revoke the use of cards.

█ However, we believe that the crucial issue is not when the credit line is exhausted, but when the debtor knows or has reason to know that it is exhausted. The credit card issuer's only engagement is to allow use of the card until the credit line is exhausted. Moreover, a debtor's knowledge and intention to deceive the creditor are always among the conjunctive elements of any § 523(a)(2)(A) proceeding.

We also agree, to some extent, with the holdings of *Faulk, Carpenter,* and *Wilson* that a debtor who knowingly uses a credit card without an intention to pay for the charges made should not be exempted from a finding of nondischargeability. We thus agree, in part, with the observations of the *Ward* dissent that a credit-card issuer should not *always* be held to assume the risk that a user will not pay for charges made. 857 F.2d at 1087–88. We believe that the Plaintiff or any other credit-card issuer is entitled to assume that the user will at least intend to pay it back for charges made, and that virtually all users would agree that a credit-card-issuer is reasonable in relying upon at least that promise from any prospective card-user.

█ However, we part company from those courts when they attempt to reduce the subjective element of knowing and intentional misuse of a credit-card into a series of objective tests. A thousand objective factors do not necessarily equal the requisite subjective intent to defraud. Meanwhile, a court should be free to find subjective fraud from, for example, statements of a debtor to third parties which reveal an actual intent to defraud in an unguarded moment, even when the objective factors are absent. For this reason, we conclude that actual fraud, as opposed to any variety of constructive fraud, should alone constitute an alternative basis for finding nondischargeability, in addition to the situation in which the card user makes use of the card in excess of what is known or should be known are its limits.

### 7. THE DEBTS IN ISSUE ARE NON-DISCHARGEABLE ONLY TO THE EXTENT OF $23.72.

█ Application of a pure *Roddenberry* analysis to the proceeding at bar would result in an adjudication of dischargeability of the Wife's indebtedness to the Plaintiff, as the Plaintiff never sought to revoke her use-privileges until the September 13, 1989, statement, after which she did not use it. A pure *Ward* analysis would also result in total nondischargeability, because we find that the Plaintiff's pre-issuance investigation of the Wife was as cursory as that of the *Ward* debtor, albeit her propensity for default was not so obvious. It is difficult for us to understand what in the Debtor's background justified the large credit-line offered to her, and Galluzzi could not answer this question.

An analysis under the six or twelve factor tests, set forth at pages 758–59 *supra,* is inconclusive. The Debtor certainly did accumulate a very large bill in a very short time, her financial condition was unstable, and the use of this card appears to be a spectacular change in her credit-card use habits. Thus, factors 1, 3, 4, 5, 7, 8, and 11 cut against her. However, factors 2, 6, 9, 10, and 12 are in her favor. She consulted counsel only after the purchases were made, with one small exception stopped using the card when she reached her credit limit, had definite prospects to

return to work, was unsophisticated in such matters relative to parties like the *Ward* debtor, and appeared to be using the card to purchase necessities for her family.

However, using our subjective-only test, we refuse to conclude that the Debtor had the intent not to pay the charges and hence, except for using the card when she was over its limit, we find that she did not knowingly make false representations with an intent to deceive the Plaintiff. The efforts of the Debtors to obtain a home-equity loan to repay the Plaintiff *before* they consulted bankruptcy counsel is the most important documented fact in their favor. *Compare Woods, supra,* 66 B.R. at 989 (circumstantial evidence of debtor's actual fraud arising from his making a loan, losing his job, and consulting bankruptcy counsel within a two-week period was held insufficient to satisfy § 523(a)(2)(A)).

As we indicated at Finding of Fact 5, pages 756–57 *supra,* the Wife had no way of knowing that the $800 advance which took her over her credit-limit in fact did so. However, as we found in Finding of Fact 10, page 757 *supra,* the final $23.72 purchase occurred several days after the Wife received a statement clearly indicating, as she must have expected, that her credit-limit was exhausted, and therefore she knew or had reason to know that this use of her credit card was unauthorized when she made this purchase. Therefore, we conclude that the indebtedness reflected by this purchase and this purchase alone was nondischargeable.

### E. CONCLUSION

An Order consistent with this conclusion will be entered. We will also include a reference to any motion to be filed under 11 U.S.C. § 523(d), which the Debtors' counsel indicated at trial, an intention to file if the Wife prevailed in this proceeding. We believe that the issue of the entitlement of the Debtors to attorney's fees is uncertain, because the debt was determined to be, at least in small part, nondischargeable. The issues raised are largely those of first impression in this district, and are, in part, inconsistent with the conclusions reached in such cases as *Lipsey, Petrini,* and *Ciavarelli* in this district. The parties should take these statements and our later Opinion in *In re Woods,* 69 B.R. 999 (Bankr.E.D.Pa.1987), into account in trying to resolve the attorney's fee issue without further court intervention.

### ORDER

AND NOW, this 22nd day of February, 1990, after a trial of February 6, 1990, and February 15, 1990, on the Complaint of the Plaintiff, MANUFACTURERS HANOVER TRUST COMPANY, and the Answer and Affirmative Defenses of the Defendant–Debtor, HEIDI J. CIRINEO a/k/a HEIDI WEINBERG, to the Complaint, it is ORDERED AND DECREED as follows:

1. Judgment is entered in favor of Plaintiff in part only.

2. The indebtedness of the Defendant to the Plaintiff is determined to be non-dischargeable to the extent of $23.72 only. All other obligations of the Defendant to the Plaintiff are DISCHARGED.

3. The parties are directed to confer to resolve the issue of potential attorney's fees and costs due to the Debtor's counsel pursuant to 11 U.S.C. § 523(d). However, if they are unable to resolve this issue, and the Debtors' counsel has made a reasonable demand, the Debtors' counsel is accorded an opportunity to file a Motion requesting attorney's fees and costs, including compensation on the fee application, on or before March 29, 1990, in procedural conformity with *In re Meade Land and Development Co., Inc.,* 527 F.2d 280 (3d Cir.1975); and *In re Mayflower Associates,* 78 B.R. 41 (Bankr.E.D.Pa.1987).