**In re Joseph H. ROCCO and Virginia M. Rocco, Debtors.**

**Universal Bank N.A., Plaintiff,**

v.

**Virginia M. Rocco, Defendant.**

**Bankruptcy No. 99–10578 DAS. Adversary No. 99–0321.**

United States Bankruptcy Court, E.D. Pennsylvania, Philadelphia Division.

Sept. 30, 1999.

David A. Kasen, Kasen, Kasen & Braverman, Philadelphia, PA, for debtors.

Joseph Diorio, Philadelphia, PA, for plaintiff.

Christine C. Shubert, Tabernacle, NJ, trustee.

Frederic Baker, Ass't U.S. Trustee, Philadelphia, PA, United States Trustee.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

Before this court is a motion ("the Motion") of counsel for the Debtors seeking

attorneys' fees and costs, pursuant to 11 U.S.C. § 523(d), against a credit card issuer which, on the day of trial, voluntarily dismissed an action seeking to have the indebtedness of one of the Debtors to it declared non-dischargeable under 11 U.S.C. § 523(a)(2)(A). Finding it necessary, in light of our experience that debtors' counsel are too quick to compromise such actions, to reiterate that the creditor's burden of proving that a § 523(a)(2) action is "substantially justified" or that "special circumstances" exist in order to avoid § 523 liability is a heavy one, we grant the Motion in the full amount of $5,193.40 requested, plus a requested $1500 enhancement for counsel's being compelled to attend a hearing to sustain the Motion.

## B. PROCEDURAL AND FACTUAL HISTORY

VIRGINIA M. ROCCO ("the Wife") and JOSEPH H. ROCCO ("the Husband"; with the Wife, "the Debtors") filed a voluntary joint Chapter 7 bankruptcy case on January 15, 1999. On April 19, 1994, one day before the deadline for filing challenges to the Debtors' discharge or dischargeability of any of their debts, UNIVERSAL BANK, N.A. ("the Bank") filed an adversary proceeding ("the Proceeding") challenging the dischargeability of the Wife's indebtedness of $4879.50 to it pursuant to 11 U.S.C. § 523(a)(2)(A).

The Complaint filed in the Proceeding alleged that, in October 1998, at which time the Wife's indebtedness on a "Universal Gold Card Mastercard" issued by the Bank was $2440.93, she withdrew $1500 from their credit line and made purchases of $634.93, and never made any further payments. The core allegations of the Complaint, at paragraphs 12 to 17 and 19 are as follows:

12. At the time of each and every action and representation complained of ... Defendant did not have the ability to repay Plaintiff, and Defendant knew or should have known of this inability to repay, or incurred the debt with reckless disregard as to the belief that Defendant could repay the debt to Plaintiff.

13. Defendant was already insolvent at the time of the cash advances and purchases, and did not have the present ability or realistic future possibility to repay the debt.

14. Defendant therefore had a specific intent to defraud Plaintiff by accepting the benefits of the credit line without ever intending to repay same.

15. Defendant's actions constitute material misrepresentations of fact which were intended to be relied upon by Plaintiff in extending credit to the Defendant.

16. Plaintiff, in fact, did justifiably rely upon Defendant's misrepresentations of repayment and was induced to lend money and/or extend credit to Defendant by said misrepresentations.

17. As a result of Defendant's actions, which actions amount to actual fraud, Plaintiff has thereby sustained a loss; to wit, that Plaintiff was defrauded into continuing to extend credit to the Defendant and forbearing collection efforts, such that Plaintiff sustained a total loss of $4,879.50 . . . .

19. By Defendant's actions, Defendant obtained money and/or and extension of credit from Plaintiff through false pretense, false representations and/or actual fraud . . . . .

The summons established the deadline for answering the Complaint as May 19, 1999, and the date of the trial of the Proceeding as June 3, 1999. An answer was timely filed by the Wife, and the Debtors' counsel and their witnesses appeared for trial on June 3, 1999. However the Bank requested a lengthy continuance despite not having advised the Debtors of this request beforehand. Over the Debtors' opposition we granted a final continuance of the trial to August 3, 1999, on the condition that the Bank compensate the Debtors' counsel in the amount of $250.

When the parties mutually sought a further continuance of the trial to August 19, 1999, we most reluctantly granted it, with the proviso that in no event would any further continuances be permitted.

On August 19, 1999, the Bank announced that it wished to withdraw the Complaint. We allowed it to do so, under the conditions of an order of August 19, 1999, which provided that

> the parties shall do their best to agree upon reasonable attorneys' fees and costs which are due to the Debtors' counsel, pursuant to 11 U.S.C. § 523(d). If this matter is not resolved by August 27, 1999, the Debtors' counsel may, on that date, file a motion requesting this court to award a fee, said motion to be procedurally in conformity with Local Bankruptcy Rule 2016-3. However, if the Debtors' counsel has made a reasonable request for such fees which are refused, said counsel may recover compensation for time spent in preparing his fee applications.

On August 27, 1999, the Motion was filed, requesting compensation for 20.3 hours of services at $250/hour, total fees of $5075, plus costs of $118.40, or a total of $5,193.40. The Bank filed a lengthy Answer and Memorandum of Law opposing the Motion, and a hearing on the Motion was scheduled on September 23, 1999.

The Debtors filed a Memorandum of Law in response to the Bank's submission on September 21, 1999. At the hearing the Bank offered depositions of the Debtors which it had taken on August 13, 1999, in preparation for the trial. The Debtors each presented testimony.

At the close of the hearing the Bank requested an opportunity to submit authorities supporting its contention that the Motion should be denied due to the Debtors' alleged "unclean hands." We allowed both parties to make brief supplemental submissions by the end of the day on September 27, 1999, but neither offered anything further. The Debtors' counsel requested that his time records be supplemented for six hours of time, at $250 per hour, for the preparation of the Memorandum of Law and his attendance at the September 23, 1999, hearing, both of which had occurred after he had prepared the Motion.

## C. DISCUSSION

At a presentation including another judge of this court at the Eastern District of Pennsylvania Bankruptcy Conference ("the Conference") on January 24, 1997, it was suggested that some issuers of credit cards were filing § 523(a)(2)(A) actions of questionable merit on the theory that such claims would be settled by debtors anxious to "buy peace" and thereby avoiding trials and the cost of hiring counsel to defend them. Although the purpose of this presentation was to solicit volunteers to defend such proceedings, this court decided on a more direct tack at confronting this problem. We decided to treat settlements of all dischargeability complaints in our cases like the reaffirmation agreements which they resembled in substance.

At that time, we were already conducting discharge hearings in all cases where reaffirmation agreements were filed and were approving or disapproving such agreements only after colloquies with the debtors and counsel. We might add that a substantial percentage of these agreements were disapproved. Therefore, we decided to conduct discharge hearings after notice to all interested parties of the terms of settlements of dischargeability proceedings in which the debtors had agreed to make payments to the creditor-plaintiffs, and conduct similar colloquies before we approved such agreements.

We discovered that what had been suggested might be the case during the Conference presentation was in fact true. Many dischargeability proceedings *were* being settled by debtors' agreements to make substantial payments to creditors, even in cases where the creditors stood very stood very little chance of prevailing

on fraud claims. Many of these cases involved credit card usage, often a fairly short time before a bankruptcy filing, but often also prior to the debtor's consulting bankruptcy counsel or seriously considering bankruptcy. We found ourselves, often to the chagrin of debtors and their counsel as well as creditors, being unwilling to approve a good percentage, perhaps as many as one-third, of these proposed settlements.

Unfortunately, disapproval of such settlements left us no choice but to schedule the one thing no party wanted: a trial on the proceeding challenging dischargeability. However, doubtlessly in light of our preliminary conclusions that the complaints lacked merit in denying approval of the settlements, in every instance but one, when the trial date arrived, the creditors agreed to voluntarily dismiss the complaints. The only exception was an instance in which the parties convinced us, after the discharge hearing colloquy, that there were material facts adverse to the debtor's position which had not come out during the colloquy and which supported the creditor's actions. We ultimately approved the settlement agreement in that case.

Our experience of examining settlements in dischargeability proceedings convinces us that many of these actions have little merit and are, from a legal stand point, unwisely settled by the debtors and their counsel. However, it has also revealed to us the tremendous pressures placed on debtors' counsel in these situations. If a settlement which the debtors approve is not effected, counsel is faced with the prospect of defending the debtor at a trial, the services for which the debtor is likely to be unable to pay.

█ It is to alleviate the problem of financing defenses of certain dischargeability complaints that 11 U.S.C. § 523(d), which provides as follows, was enacted:

(d) If a creditor requests a determination of dischargeability of a consumer debt under subsection (a)(2) of this section, and such debt is discharged, the court shall grant judgment in favor of the debtor for the costs of, and a reasonable attorney's fee for, the proceeding if the court finds that the position of the creditor was not substantially justified, except that the court shall not award such costs and fees if special circumstances would make the award unjust.

Our experience with discharge hearings in cases where settlement of § 523(a)(2)(A) are effected convinces us that, despite the presence of § 523(d), assuring a strong consumer defense in even totally meritless § 523(a)(2)(A) actions remains a problem. There is, therefore, a policy to be served in interpreting this section broadly in favor of debtors and their counsel.

We are not certain that our own decisions have uniformly supported this principle. In *In re Woods*, 69 B.R. 999, 1001–02 (Bankr.E.D.Pa.1987), we got off to what we now believe was a good start in this area by holding that § 523(d) adopted the standards of the Equal Access to Justice Act, 28 U.S.C. § 2412 ("EAJA"), and, rather than requiring a finding of "bad faith or frivolous" action by the creditor to succeed, allowed the creditor to escape § 523(d) liability only if it proved, like the government an EAJA Motion,

all of the following elements: (1) a reasonable basis in truth for the facts alleged; (2) a reasonable basis in law for the theory it propounds; and (3) a reasonable connection between the facts alleged and the legal theory advanced. *Brinker* [*v. Guiffrida*], 798 F.2d at [661,] at 664 [(3d Cir.1986)]; *Tressler* [*v. Heckler*], 748 F.2d [146,] at 149–150 [(3d Cir. 1984)]; and *Dougherty* [*v. Lehman*], 711 F.2d [555,] at 564 [(3d Cir.1983)]. [Moreover,] [t]he government must make a strong showing on each of the foregoing elements to meet its burden; and the burden "is not met merely because the government adduces 'some evidence' in support of its position."

*Washington,* 756 F.2d at 961; *Tressler,* 748 F.2d at 150.

*Id.* at 1001.

In two subsequent cases, *In re Fulginiti,* 201 B.R. 730 733–35 (Bankr.E.D.Pa. 1996); and *In re Cirineo,* 110 B.R. 754, 757–63 (Bankr.E.D.Pa.1990), we established our standards for deciding the merits of credit card cases instituted under § 523(a)(2)(A). In *Cirineo* we held that (1) a subjective test, focusing on the consumer's intention to pay, should be utilized in preference to the objective set of factors then used by many courts. *Id.* at 761–62, 758–59. In *Fulginiti* we pointed out that the 11 U.S.C. § 523(a)(2)(C) presumption that making cash advances or purchasing luxury goods in excess of $1000 within sixty days of bankruptcy constitutes fraud is not so difficult to overcome in the typical situation of a debtor's sudden realization, after these advances or purchases are made with an intent to pay, that bankruptcy is advisable. 201 B.R. at 733–35. We also reiterated our *Cirineo* holdings that the debtor's subjective intent is the critical factor, and that a debtor's intent to pay should not be confused with the debtor's often ability to pay in assessing the debtor's liability under § 523(a)(2)(A) in a credit card case. *Id.* at 735.

However, neither case articulated a strong § 523(d) policy. *In Fulginiti,* in fact we indicated that we would be "disinclined" to grant a § 523(d) motion because the debtor's counsel had, in our view, created the § 523(a)(2)(C) problem for the debtors by not waiting to file their bankruptcy until after the sixty-day period had run. 201 B.R. at 735–36. In *Cirineo* we suggested that the disposition of a § 523(d) would be "uncertain" because the issues decided were believed to be those of first impression in this district and because we had held that a small portion of the debt at issue was nondischargeable. 110 B.R. at 763.

In retrospect we believe that our statements relative to § 523(d) in *Fulginiti* and *Cirineo* were too timid and gave the wrong message. If these decisions were justifiable because they were our first pronouncements on several substantive issues relevant to credit card § 523(a)(2)(A) proceedings, creditors can now, by reviewing these decisions, determine which credit card actions are likely to prevail and which are not likely to prevail before this court. Complaints alleging nothing or very little beyond alleging a debtor's purported inability to repay a credit card debt do not allege a winnable § 523(a)(2)(A) case. Creditors who persist in filing such actions should have a difficult time making the requisite strong showing of the three elements necessary to successfully defend a § 523(d) action. We note that a large number of recent decisions concur with this analysis. *See, e.g., In re Sales,* 228 B.R. 748, 752 (10th Cir. BAP 1999); *In re Williams,* 224 B.R. 523, 530–32 (2d Cir. BAP 1998); *In re Stahl,* 222 B.R. 497, 504–07 (Bankr.W.D.N.C.1998); *In re Le,* 222 B.R. 366 (Bankr.W.D.Okla.1998); *In re Mack,* 219 B.R. 311, 314–15 (Bankr. N.D.Fla.1998); *In re Poirier,* 214 B.R. 53, 55–56 (Bankr.D.Conn.1997) *In re Arroyo,* 205 B.R. 984, 986–87 (Bankr.S.D.Fla.1997); *In re Stansel,* 203 B.R. 339, 343–44 (Bankr. M.D.Fla.1996); and *In re Chinchilla,* 202 B.R. 1010, 1015–17 (Bankr.S.D.Fla.1996).

As can be ascertained from analysis of the case allegations of the Complaint in the Proceeding quoted at pages 299–300 *supra,* these allegations are archetypical of the "inability to pay equals fraud" ilk. This is precisely the type of complaint which the *Fulginiti* and *Cirineo* decisions indicated was lacking in merit. It is the type of complaint that our discharge hearings were intended to preclude from serving as bases for squeezing money out of debtors with no legal bases of support; and it is therefore the type of case in which § 523(d) motions should almost certainly prevail.

The Bank attempts to avoid this result by emphasizing two adverse facts which it was able to cull from the Debtors in the

eleventh-hour depositions of the Debtors on August 13, 1999:(1) the Wife, apparently the only defendant because she was the only applicant and issuee of the Bank's credit card, filled in $50,000 as the Debtors' "Annual Income" on a form in which the Bank "accept[ed] your invitation to receive the AT & T Universal Gold Mastercard" for a "pre-approved credit line. Up to $25,000. . . ." The Debtors' net income in 1997, including disability benefits to the Husband (about $14,000 annually) and their children (about $11,000 annually), the Husband's pension (about $2,000 annually), and income from a self-owned limousine service and pest-control service businesses (about $9,000) totaled only about $36,000; and (2) the Debtors failed to disclose certain vacation and Christmas club bank accounts from which they withdrew approximately $1,000 about three months prior to their bankruptcy filing on their Schedules.

The Debtors countered by pointing out that their businesses had a *gross* income of about $33,000 in 1997, which would increase their *gross* annual income to about $60,000, and that the application does not indicate whether it is requesting gross or net annual income. Further, they note that the Bank presented no evidence regarding the relationship between the disclosure of their annual income and the issuance of the credit card to them. They note that, since the issuance of the card was pre-approved, albeit that the amount of the credit line was not yet established, this disclosure may have been irrelevant to the credit line provided.

The Bank argued that the Debtors' omission of reference to certain of their bank accounts constitutes "unclean hands" which justifies their Complaint against the Debtors. The Debtors responded that, while the omitted assets could be relevant to an action under 11 U.S.C. § 727(a)(4)(A), they have no relevance to the Bank's factual or legal justification for initiating the Proceeding, which did not invoke § 727.

■ The Debtors' arguments are clearly more persuasive. The Bank was obliged to make a strong showing of any relevant facts and of the connection between these facts and the legal theory justifying its Complaint to allow us to consider same on a § 523(d) motion under the principles enunciated at pages 301–02 *supra.* No evidence regarding the significance of the disclosure of the Debtors' annual income on the application form was proven by the Bank. Of "unclean hands," the Court of Appeals, in *In re New Valley Corp.,* 181 F.3d 517, 525 (3d Cir.1999), has recently said:

> there must be a relationship between the inequitable conduct and the claims brought before the court in order for the doctrine to apply; even then, the court has discretion to limit the reach of the doctrine to only some of the claims. *See, e.g., Keystone Driller Co. v. General Excavator Co.,* 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293 ( [1933] ); *CIBA–GEIGY Corp. v. Bolar Pharmaceutical Co.,* 747 F.2d 844 [(3d Cir.1984), *cert. denied,* 471 U.S. 1137, 105 S.Ct. 2678, 86 L.Ed.2d 696 (1985)].

There was no relationship shown between the Bank's § 523(a)(2)(A) claims and the potential grounds for a § 727(a)(4)(A) claim allegedly supported by the revelations at the Bank's belated depositions.

■ The significance of the timing of the depositions also bears some comment. Several of the cases in which § 523(d) motions are upheld emphasize the importance of a creditor's failure to take a Federal Rule of Bankruptcy Procedure 2004 examination (a "2004 Exam") *prior to commencing* a dischargeability-challenge proceeding, thereby precluding the initiation of frivolous actions which appear only calculated to conduce settlements from frightened debtors. *E.g., Williams, supra,* 224 B.R. at 531; *Poirier, supra,* 214 B.R. at 58–59; *Chinchilla, supra,* 202 B.R. at 1017–18; and *Woods, supra,* 69 B.R. at 1004. If the Bank wished to develop a

§ 727(a)(4)(A) cause of action, it was "obliged to make discovery regarding the potential grounds of its claims prior to the statutory bar date, *see [In re] Desiderio, supra,* 209 B.R. [342,] at 346, [(Bankr. E.D.Pa.1997)], not after the filing of the complaint." *In re Ishkhanian,* 210 B.R. 944, 955 (Bankr.E.D.Pa.1997).

Here the Bank engaged in no 2004 Exam prior to filing its Complaint in the Proceeding. It took no discovery prior to the first scheduled trial date of June 3, 1999, nor even prior to the first continued and fixed trial date of August 3, 1999. Rather, it waited until a few days before the rescheduled final trial date of August 19, 1999 to depose the Debtors. It seems apparent that, had the Bank engaged in discovery in a timely fashion, the weaknesses in its case would have been apparent from the outset. More importantly, the stress of the Debtors due to the subjection to the long pendency of the Proceeding and their counsel's performance of most of the services which serve as the basis of the Motion would have been rendered unnecessary.

The Bank's assertions of alleged "reasonable bases" or special circumstances for its action are, moreover, not the least bit convincing. They have all of the trappings of desperate, irrelevant gasps to attempt to revive an unjustifiable § 523(a)(2)(A) action under the principles established by this court in *Fulginiti* and *Cirineo.*

■ In light of our total rejection of the Bank's defenses and its total failure to satisfy the necessary burdens which have needlessly imposed upon the Debtors and their counsel, we are definitely motivated to grant the Motion in the full amount claimed. We appreciate that the Bank withdrew the Complaint and did not compel the Debtors and their counsel to endure a useless trial on the merits. A voluntary dismissal, particularly one so belated, does not, however, abate a § 523(d) motion. *See In re Jenkins,* 225 B.R. 29, 31 (Bankr.D.Conn.1998); *In re Stockard,* 216 B.R. 237, 240 (Bankr.M.D.Tenn.1997); and

*Chinchilla, supra,* 202 B.R. at 1013. It does, of course, represent an action which reduces its § 523(d) exposure by eliminating its liability for the hours which the Debtors' counsel would have had to expend in preparing and trying the Proceeding. The court appreciates the preservation of its time which would have been wasted had it been required to hear the Proceeding before rendering the inevitable result. However, this awakening came too late to significantly reduce the Bank's § 523(d) liability.

■ The time actually spent by the Debtors' counsel, which has not been contested by the Bank, apparently for that reason could not, *see, e.g., Bell v. United Princeton Properties, Inc.,* 884 F.2d 713, 719 (3d Cir.1989); and *Cunningham v. McKeesport,* 753 F.2d 262, 267 (3d Cir. 1985) (in a statutory fee shifting case, the court may generally reduce the application only pursuant to objections by the party bearing the fees), and will not, be adjusted downward by us. Counsel's hourly rate of $250/hour, while in the high range, *see In re Dubin Paper Co.,* 169 B.R. 115 (Bankr. E.D.Pa.1994) (reducing counsel's highest allowable rates in that case to $260/hour), is supported by his experience of almost twenty (20) years as a consumer bankruptcy attorney in a neighboring jurisdiction and a high degree of competence and persistence exhibited to this court in pursuing the Motion. *Compare In re Stahl,* 222 B.R. 507 (Bankr.W.D.N.C.1998) (court reconsiders earlier orders and awards counsel the full amount of $17,754.28 sought in a § 523(d) motion). The full amount of $5793.40 sought in the instant Motion, plus $1500 for six additional hours of services performed after the Motion was filed, is appropriate and will be awarded to the Debtors' counsel in full.

## D. CONCLUSION

An order as explained by the foregoing Opinion follows.

### ORDER

AND NOW, this 30th day of September, 1999, after a hearing of September 23, 1999, on the motion ("the Motion") of the Debtors' counsel to obtain reasonable attorneys' fees and costs pursuant to 11 U.S.C. § 523(d), and upon consideration of the parties' pre-hearing submissions, it is hereby ORDERED AND DECREED as follows:

1. The Motion is GRANTED in full.

2. David A. Kasen, Esquire, is awarded attorneys' fees and costs from UNIVERSAL BANK, N.A., in the total amount of $6,693.00.