In re Miguel & Rita **CHINCHILLA,**
Debtors.

**AT & T UNIVERSAL CARD SERVICES
CORP., Plaintiff,**

v.

**Miguel CHINCHILLA, Defendant.**

**Bankruptcy No. 95–15445–BKC–RAM.
Adv. No. 96–0158–BKC–RAM–A.**

United States Bankruptcy Court,
S.D. Florida.

Dec. 3, 1996.

Kathe Kozlowski, Coral Gables, FL, for Defendant/Debtor.

James Schwitalla, Miami, FL, for Plaintiff.

### MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO TAX FEES & COSTS

ROBERT A. MARK, Bankruptcy Judge.

Defendant, Miguel Chinchilla (the "Debtor"), seeks attorney's fees and costs, pursuant to § 523(d) of the Bankruptcy Code, incurred in defending an adversary proceeding filed by AT & T Universal Card Services ("AT & T") under § 523(a)(2)(A) of the Bankruptcy Code. Since the Court finds that AT & T was not substantially justified in filing its action against Mr. Chinchilla, Mr. Chinchilla's Motion to Tax Fees and Costs is granted.

### PROCEDURAL BACKGROUND

Mr. Chinchilla and his wife, Rita (the "Debtors"), filed a Chapter 7 bankruptcy petition on November 8, 1995 (the "Filing Date"). On February 9, 1996 AT & T filed an adversary complaint alleging fraudulent use of its credit card and seeking to except from discharge credit card debt slightly in excess of $7,000 that was owed to AT & T at the time of the bankruptcy filing. On March 5, 1996, Mr. Chinchilla filed an answer and a counterclaim for attorney's fees and costs under § 523(d) alleging that AT & T's complaint was unjustified.

On April 24, 1996, AT & T stipulated to the dismissal of its adversary complaint and an Order of Dismissal was entered on that date, with the Court reserving jurisdiction to con-

sider the claim for attorney's fees. On June 11, 1996, Mr. Chinchilla filed his Motion to Tax Attorney's Fees and Costs. The Court conducted an evidentiary hearing on the Motion on September 12, 1996. After consideration of the motion, Mr. Chinchilla's testimony, the exhibits introduced into evidence, and the arguments of counsel, the Court announced its findings and conclusions on the record. This Memorandum Opinion and Order incorporates and supplements those findings and conclusions.

## FACTUAL BACKGROUND

As of March 1995, Mr. Chinchilla owed approximately $3,700 on an account with AT & T that had a limit of $6,500. Between March 18, 1995 and July 31, 1995, the Debtors made 35 purchases totaling approximately $3,700. AT & T's Exhibit No. 1. Mr. Chinchilla continued, at all times, to make the required minimum payments on the card, including a $146.00 payment on August 15, 1995. He voluntarily canceled the AT & T card at or about the end of July.

The Debtors' bankruptcy schedules listed over $60,000 in unsecured debt, including over $7,200 owed to AT & T. AT & T's Exhibit No. 10. Schedule J of the schedules showed monthly expenses of approximately $2,200, not including any debt service to AT & T or on any other credit card debt. AT & T's Exhibit 10. Schedule I listed $1,900 in monthly income for Mr. Chinchilla and no income for his wife on the Filing Date. However, the Chinchillas' Statement of Financial Affairs disclosed that Mrs. Chinchilla had earned $15,745 in 1995. The testimony revealed that Mrs. Chinchilla was working when the charges were made but was declared disabled and lost her job shortly before the Filing Date.

## DISCUSSION

■ Mr. Chinchilla seeks attorney's fees and costs under 11 U.S.C. § 523(d) incurred

in defense of AT & T's § 523(a)(2)(A) fraud claim. That section provides that if a creditor seeks to except a consumer debt from discharge pursuant to § 523(a)(2), and that debt is discharged, the court shall grant attorney's fees and costs to the consumer debtor if the creditor's position in filing the suit was not substantially justified. Section 523(d) of the Code was enacted for the protection of consumer debtors such as Mr. Chinchilla. It is intended to prevent a creditor from bringing a dischargeability action in order to coerce a settlement from an honest debtor who cannot afford to litigate. *In re Shurbier*, 134 B.R. 922 (Bankr.W.D.Mo.1991), *citing* H.Rep. No. 595, 95 Cong., 1st Sess., 131 (1977), U.S.Code Cong. & Admin.News, 1978, p. 5787.

After AT & T agreed to a voluntary dismissal, the burden fell on AT & T to prove that it was substantially justified in filing its complaint. AT & T failed to meet its burden since the Complaint was not justified, substantially or otherwise. Therefore AT & T must pay the fees and costs of Mr. Chinchilla's defense.

### A. The § 523(a)(2)(A) Standard

■ The Court must first determine the applicable standard in a § 523(a)(2)(A)[1] credit card complaint in order to evaluate whether the facts in the record substantially justified AT & T's filing. To successfully bring an action under § 523(a)(2)(A), a creditor must prove that the debtor committed "actual fraud". *Anastas v. American Savings Bank (In re Anastas)*, 94 F.3d 1280, 1283 (9th Cir.1996) ("*Anastas*"). To prove "actual fraud", a creditor must establish the following common law elements of fraud:

(1) [that] the debtor made the representations;

(2) that at the time he made those representations the debtor knew they were false;

---

1. Section 11 U.S.C. 523(a)(2)(A) provides as follows:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

(2) for money, property, services or an extension, renewal, or refinancing of credit, to the extent obtained by—
(A) false pretenses, or **actual fraud,** other than a statement respecting the debtor's or an insider's financial condition.
(emphasis added).

(3) that he made them with the intention and purpose of deceiving the creditor;

(4) that the creditor relied on such representations; and

(5) that the creditor sustained the alleged loss and damage as the proximate result of the representations made.

*Anastas,* 94 F.3d at 1284; *See also Field v. Mans,* —— U.S. ——, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) (holding that the standard for "actual fraud" under § 523(a)(2)(A) is analogous to the standard for fraud under the common law of torts). A finding of "actual fraud" in a credit card case will only arise where the creditor proves that the debtor incurred the charges with no intention to pay and not if the creditor simply proves that the debtor incurred the debt with no ability to pay. *See Anastas,* 94 F.3d at 1285; *In re Ford,* 186 B.R. 312, 319 (Bankr.N.D.Ga. 1995).

 In applying the elements of "actual fraud" to credit card cases, many courts apply the "totality of the circumstances" approach enunciated in *Citibank South Dakota v. Dougherty,* 84 B.R. 653 (9th Cir. BAP 1988). *See Citibank (South Dakota), N.A. v. Eashai (In re Eashai),* 87 F.3d 1082, 1086 (9th Cir.1996) ("*Eashai*") (9th Cir.1996); *Anastas,* 94 F.3d at 1284; *In re Grayson,* 199 B.R. 397, 402 (Bankr.W.D.Mo.1996). In *Dougherty,* the court held that a debt will be considered non-dischargeable under § 523(a)(2)(A) where the debtor incurred the debt fraudulently, with no intention of paying back the creditor. The *Dougherty* court adopted the following set of objective factors for determining a debtor's intent:

1. The length of time between the charges made and the filing of bankruptcy;

2. Whether or not an attorney has been consulted concerning the filing of bankruptcy before the charges were made;

3. The number of charges made;

4. The amount of the charges;

5. The financial condition of the debtor at the time the charges are made;

6. Whether the charges were above the credit limit of the account;

7. Whether the debtor made multiple charges on the same day;

8. Whether or not the debtor was employed;

9. The debtor's prospects for employment;

10. The debtor's financial sophistication;

11. Whether there was a sudden change in the debtor's buying habits; and

12. Whether the purchases were made for luxuries or necessities.

84 B.R. at 657. This Court agrees that these factors should be considered in determining whether a debtor fraudulently used a credit card.[2]

 The *Dougherty* approach permits a court to infer the existence of the debtor's intent to defraud a creditor "if the facts and circumstances of a particular case present a picture of deceptive conduct by the debtor." *Eashai,* 87 F.3d at 1087. Although one of the factors enumerated in *Dougherty* is the financial condition of the debtor, the focus of a 523(a)(2)(A) inquiry should not be solely on whether the debtor is insolvent at the time the credit card purchases were made. *Anastas,* 94 F.3d at 1285–86. The express focus should be on whether the debtor showed bad faith by incurring the credit card debt with the actual intent of not repaying it. *Id.* "If the ability to repay were the focus of the [523(a)(2)(A) ] inquiry, too often would there

---

**2.** The *Dougherty* case discusses two other approaches accepted by courts. 84 B.R. at 655–656. Some courts have adopted the "assumption of the risk" approach. *Id.* (citing *First National Bank of Mobile v. Roddenberry,* 701 F.2d 927 (11th Cir.1983)). This approach states that the creditor can only prevail under § 523(a)(2)(A) if it has communicated a revoca-

tion of the credit card to the debtor and the debtor continues to use the card. *Id.* Courts on the other end of the spectrum have adopted the "implied representation" theory which states that each time a cardholder uses a credit card he or she impliedly represents that he or she has the ability and intention to pay. *Id.*

be an unfounded judgment of non-dischargeability of credit card debt." *Id.; See also Matter of Ford,* 186 B.R. 312 (Bankr.N.D.Ga. 1995) (mere inability to pay is not grounds for excepting a debt from discharge). There must be enough evidence to support an actual finding of bad faith. *Anastas,* 94 F.3d at 1286.

### B. AT & T Lacks Substantial Justification

■ AT & T relies on several of the *Dougherty* factors to prove that its filing was justifiable. It argues that: (1) the last charge made by Mr. Chinchilla was only three months prior to the filing; (2) there were 35 purchases within a three month span from March to July of 1995; (3) the charges made during this period were in excess of $3,700; (4) Mr. Chinchilla exceeded his $6,500 credit limit during the period in question; and (5) the Debtor's income at the time he incurred the charges was insufficient to enable him pay to back the debts he incurred from March to July. AT & T argues that these facts prove that it was substantially justified in bringing a § 523(a)(2)(A) action against Mr. Chinchilla.

### 1. AT & T's Hypocrisy

■ The Court first addresses the latter two assertions, namely, that the Debtor exceeded his credit limit and that the Debtor's allegedly poor financial condition when the charges were incurred rendered him incapable of repaying the charges. As discussed below, AT & T's reliance on these facts is both unpersuasive and hypocritical.

With respect to the Debtors' credit limit, as of May 18, 1995, the Debtors' AT & T account balance was $6,176.66; their credit limit was $6,500. During the next thirty days, they used their card for $646.22 in new purchases, received a credit for $93.75, and made the $130.00 minimum monthly payment reflected on their current bill. Before application of the new finance charge of $104.11, the account balance was $6,599.13, *less than $100 over their limit.* It is not the fact that the Debtors only slightly exceeded their credit limit which generated the Court's comment on AT & T's hypocrisy. Rather, it is the fact that AT & T's response to the Debtors exceeding their limit by $100 was to raise their limit to $8,500. AT & T's Exhibit No. 1. How can AT & T now point to Mr. Chinchilla exceeding his limit by $100 as an "indicia of fraud" when its response at the time was to immediately grant him an additional $2,000 in unsolicited credit?

■ Admittedly, AT & T did not focus heavily on the credit limit factor. Rather, AT & T filed its Complaint relying primarily upon Mr. Chinchilla's apparently dilapidated financial condition at the time he and his wife made the purchases. AT & T derived Mr. Chinchilla's financial condition from circumstantial evidence by looking at the income and debt listed in the bankruptcy schedules. As AT & T's counsel admitted during the hearing, this procedure results in merely an "educated estimate" of the Debtor's financial condition at the time the Debtors used their AT & T card. The Debtor's financial condition is relevant, but it is not enough standing alone, nor is it the primary focus, when the inquiry is into the intent to repay and not the ability to repay. *See Anastas,* 94 F.3d at 1284.

AT & T's emphasis on its cardholders' financial condition is not only legally insufficient, it is another disturbing display of institutional hypocrisy. At the marketing stage, credit sellers like AT & T actively solicit new business with limited knowledge of the financial condition of their targeted customers.[3] Mr. Chinchilla's AT & T card was pre-approved and sent to him unsolicited. The targets of these solicitations undoubtedly include already overextended consumers who are still able to make the advertised low minimum payments. Once a card is issued,

---

**3.** The five largest banks selling credit in the United States sent out approximately 550 million mailings during the first six months of 1996 soliciting consumers to use their cards. Jeff Bailey, *Banks Focusing on Credit Cards Grab Market Share* Wall St.J., Oct. 1, 1996 at B4.

many of these new customers pay only the minimum monthly payments and the card companies eagerly apply high interest rates to the unpaid balance generating substantial profits.[4]

Mr. Chinchilla is a good example. In the billing period ending April 17, 1995, he made the required $78.00 minimum payment, but incurred $92.14 in finance charges (at an annual rate of 18.90%). Over the next several months, the finance charges ate up most of the minimum payments, leaving little to be applied in reduction of his account balance.

Eventually, many consumers face financial ruin when the sheer weight of their debt, often combined with unforeseen income losses (like the loss of Mrs. Chinchilla's income when she became disabled), render them incapable of maintaining even the minimum payments and clearly unable to repay the underlying debt. Many, like the debtors here, seek bankruptcy protection and a fresh start. At this point, the credit card marketing team abruptly ends its relationship with the consumer and the legal team takes over. It is only then that the card companies make their first meaningful investigation into a debtor's financial condition.

If AT & T and other credit card issuers want to continue their business policy of soliciting consumers to use their cards with little regard for their financial ability, that is fine. Their business policy is not subject to judicial review.[5] If the card companies want to file complaints to except fraudulent credit card debt from discharge in a bankruptcy case, that is fine too. What this Court will not condone are the different and indeed, hypocritical standards applied by credit card companies like AT & T in pursuing these otherwise permissible business and legal pursuits.

Credit card companies cannot issue a card without regard to financial condition and then complain that they were defrauded when they later learn that the consumer had several other debts at the time the card was used. They cannot encourage and, in fact, thrive on the high interest accruing when consumers make only their minimum monthly payments and then later look back and ask the Court to find fraud if, viewed objectively and in hindsight, the debtors lacked the ability to pay the entire balance. They cannot increase the credit limit when the cardholder exceeds the original limit and then point to the month in which the limit was exceeded as further evidence of the alleged fraud.

■ The bottom line message is simple and fair. A card issuer or any lender can require a borrower to provide written financial information and then make a credit decision justifiably relying upon that information. If it turns out that the written statement materially misrepresented the borrower's financial condition, proof of the debtor's actual financial condition will be important evidence in proving that the debt should be excepted from discharge under § 523(a)(2)(B). If instead, the lender rolls the dice and issues a credit card without reliance on the debtor's financial condition, the actual financial condition at the time the card was used will not take it very far in proving actual fraud under § 523(a)(2)(A). *Anastas,* 94 F.3d at 1285–1286.

A lender can prove fraud circumstantially but cannot meet its burden with a thin record relying heavily on the debtor's probable financial condition when the card was used. These fraud cases should only be filed when the facts derived from a pre-filing investigation (which will almost always require at

---

4. Credit Card profits since 1982 have been significantly higher than the profits associated with the United States banking system at large. Lawrence M. Ausubel, *Credit Card Defaults and Credit Card Profits,* 1996 National Conference of Bankruptcy Judges, October, pp. B–5 to B–16, Fall 1996 (a revised version of this article is scheduled for publication in the American Bankruptcy Law Journal).

5. At a plenary session of the Bankruptcy Review Commission on October 18, 1996 in San Diego, a VISA representative suggested to the Commission that easier credit card availability has "democratized" access to credit in this country. If this is so, part of the price of this freedom to borrow is a marked rise in consumer bankruptcy filings correlated closely with this "democratization" of credit. *Supra, Ausubel,* n. 4.

least informal inquiry) enable the plaintiff to show that the debtor used his or her credit card without intending to repay the debt.

## 2. AT & T's Inadequate Investigation

■ The likelihood of filing an unjustified fraud complaint against a credit card user is increased where, as here, the prefiling investigation is both minimal and negligent. The importance of a prefiling investigation in these types of cases was addressed at length in Bankruptcy Judge Federman's recent opinion, *In re Grayson,* 199 B.R. 397, 401–403 (Bankr.W.D.Mo.1996). There, the court held that the absence of a prefiling inquiry warranted taxation of attorney's fees and costs against a credit card company (also coincidentally AT & T) for unjustifiably filing a § 523(a)(2)(A) action.

In *Grayson,* AT & T's § 523(a)(2)(A) action against the debtor was voluntarily dismissed when the Court would not approve a settlement without a hearing.[6] *Id.* at 399. AT & T did not attend the § 341 meeting and did not conduct a Bankruptcy Rule 2004 examination of the debtor before it filed its complaint. *Id.* Noting that a 523(a)(2)(A) complaint makes the serious allegation of fraud, the Court held that AT & T should have examined the debtor prior to filing its complaint to determine whether its allegation of fraud was substantially justified. *Id.* at 401. The court concluded that AT & T's actions, or lack thereof, precluded a valid inquiry into the *Dougherty* factors and thus made the filing unjustifiable.

In this case, like in *Grayson,* AT & T failed to attend the § 341 meeting, did not

conduct a Bankruptcy Rule 2004 examination and did not even informally contact the debtor before it filed its complaint. Any prefiling contact with the Debtor probably would have elicited a critical fact, namely Mrs. Chinchilla's employment status. Mrs. Chinchilla was not employed at the time of the bankruptcy filing because she was declared disabled shortly before the filing. She *was* employed at the time of the credit card purchases which AT & T argues were fraudulent. The Debtors' combined income at that time was almost double what it was when they filed their Chapter 7 petition. Any formal or informal prefiling inquiry would have revealed this material change in the Debtors' financial condition between the time of the card usage and the Filing Date. AT & T's counsel admitted that this key fact was not picked up from the limited review conducted before the filing of the complaint. This limited review apparently did not even include a full review of the Debtors' schedules since the Statement of Financial Affairs revealed that Mrs. Chinchilla had earned $15,745 in 1995 and therefore had probably been working when the charges were incurred in March through July.

AT & T's counsel argued that the process of discovery takes place after the filing of a complaint so a case need not be ready for trial on the day a party files the complaint. AT & T's concept of discovery and trial preparation may generally be sound, but not when a plaintiff is suing for fraud and where, by statute, the plaintiff must do enough prefiling investigation to ensure that the complaint is "substantially justified."

■ The Court is not saying that AT & T must attend the § 341 meeting or must con-

---

**6.** After lengthy analysis of bankruptcy policy and practical concerns, Judge Federman concluded that settlements of § 523 adversaries should not be approved "without some evidence that there is a reasonable basis for the entry of same, that the debtor both understands and agrees to the terms, and that the debtor is aware of his or her right to a trial on the merits." 199 B.R. at 401. For some of the same reasons, including the fact that the settlements are closely analogous to reaffirmations under § 524(c), the judges in the Southern District of Florida have adopted a local rule requiring a hearing on all settlements of discharge adversaries with pro se debtors. Un-

der the rule, the settlements will only be approved if the Court finds:

(1) ... that there is a justiciable issue as to the nondischargeability of the creditor's claim;

(2) that the agreement represents a fully informed and voluntary agreement of the debtor;

(3) that the agreement does not impose undue hardship on the debtor or dependent of the debtor; and

(4) that the settlement is in the best interest of the debtor.

Rule 788, Local Rules, United States Bankruptcy Court, Southern District of Florida.

duct a 2004 examination before ever filing a § 523(a)(2)(A) action. However, some form of discovery, at least informal communication to the debtors or their counsel, should be the norm rather than the exception. *See In re Grayson,* 199 B.R. at 402 ("the need to examine the debtor prior to filing a Complaint is particularly compelling where ... the plaintiff alleges it was defrauded by debtor.")

Prior inquiry should prevent the type of situation this case involves: a complaint that should not have been filed, and most likely would not have been filed, if there had been any meaningful effort to uncover the material facts before the filing. It is simply wrong for AT & T to argue that these kinds of additional facts can be uncovered through discovery after the filing of the adversary complaint. This proceeding proves the fallacy in that argument. Here, the Debtor was forced to expend significant legal fees to defend the complaint until the plaintiff finally "discovered" that the facts would not establish fraud.

In sum, AT & T was not substantially justified in filing this complaint without further inquiry. While some of the *Dougherty* factors may support AT & T's filing, they do not come close to "present[ing] a picture of deceptive conduct" by Mr. Chinchilla. *See Eashai,* 87 F.3d at 1087. While there may have been multiple charges within a small period of time, and while some of those charges may have been for luxury items, there is no evidence to prove that Mr. Chinchilla used his card with the actual, fraudulent intent of not repaying AT & T. At the time the purchases were made, he had a second source of income from his wife to pay the charges, an income that was eliminated when his wife was declared disabled. This fact was no doubt determinative of the even-

tual filing for bankruptcy. Moreover, Mr. Chinchilla voluntarily stopped the use of his card three months before he filed for bankruptcy and continued to make the minimum payments until that cancellation. These facts present a picture of bad luck, decency and a sense of responsibility, not the deception that AT & T negligently alleged in its Complaint.

## CONCLUSION

AT & T's case is analogous to a gunslinger in the wild west without ammunition. It does not survive. This Court is not closing the 523(a)(2)(A) "town gates" to credit card issuers. Just don't ride into town firing blanks and kicking up dust in the hope of rustling up a settlement. Come in armed with facts to prove fraud or you may be driven out of town with a 523(d) bullet in your tail.[7]

For the foregoing reasons it is—

**ORDERED** as follows:

1. The Debtors' Motion to Tax Fees and Costs is granted.

2. AT & T shall pay $2,600 to Miguel Chinchilla pursuant to § 523(d) for fees and costs incurred by Mr. Chinchilla in defending this unjustified adversary complaint.

---

**7.** Examples of such wounded credit card cowboys can be found in numerous reported decisions. *See e.g. In re Ramirez,* 184 B.R. 859, 862 (Bankr.S.D.Fla.1995) (complaint described as "nothing more than persecuting an unfortunate honest debtor and blaming that debtor for plaintiff's [AT & T's] own casual and inadequate lending practices."); *In re Williamson,* 181 B.R. 403, 409 (Bankr.W.D.Mo.1995) (In holding a credit card company responsible for fees and costs the

court stated that "[t]he only way to prevent creditors from obtaining leverage over debtor by first filing a suit and considering the merits later, is to require the creditor to pay the costs, including reasonable attorneys fees, incurred by a debtor who must defend a frivolous suit."); *In re Cordova,* 153 B.R. 352, 357 (Bankr.M.D.Fla.1993) ("This is exactly the type of overreacting by a creditor which Congress sought to curtail by the enactment of § 523(d).")