### In re Francisco PRIETO, Debtor.

### American Express Travel Related Services Company, Inc., Plaintiff,

v.

### Francisco Prieto, Defendant.

### Bankruptcy No. 00–12476 BKC–RAM. Adversary No. 00–1267.

United States Bankruptcy Court,
S.D. Florida,
Miami Division.

Jan. 30, 2001.

Gary J. Lublin, Orlando, FL, for Plaintiff.

Emmanuel Perez, Coral Gables, FL, for Defendant.

Alan Goldberg, Miami, FL, trustee.

## ORDER

JAMES G. MIXON, Bankruptcy Judge.

This proceeding is before the Court upon the complaint filed by American Express Travel Related Services Company, Inc. ("AmEx") to determine the dischargeability of credit card debt owed by Francisco Prieto ("Debtor"). AmEx alleges the Debtor incurred the debt through actual fraud.[1] After a trial on the merits, the matter was taken under advisement.

The Court has jurisdiction over this matter as a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) and may enter a final judgment in the case. The following shall constitute the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

### FACTS

The Debtor filed a voluntary petition under the provisions of chapter 7 of the United States Bankruptcy Code on March 27, 2000, having previously consulted a bankruptcy attorney on March 20. Prior to that date, the Debtor incurred charges on his AmEx credit card in the amount of $3751.93 over the two-month period December 18, 1999, to February 17, 2000, and has made no payment to defray the debt. AmEx seeks a determination that this debt is nondischargeable on the grounds that the Debtor committed actual fraud in incurring the obligation.

In determining the dischargeability of the debt, the following facts are relevant. The Debtor opened a charge account with American Express Travel Related Services in July 1984 under account number 3728–444945–001001. At the time the Debtor applied for the account, he was employed by Thoni Oil, earning $27,200.00 annually. After receiving the Debtor's application for credit, AmEx determined his credit worthiness by obtaining a credit report and verifying his listed employer.

---

1. In its complaint filed June 26, 2000, AmEx sought a determination that the debt at issue was nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(C), which pertains to the purchase of luxury items and the receipt of cash advances within sixty days before bankruptcy. However, AmEx and the Debtor subsequently proceeded under a cause of action for actual fraud pursuant to 11 U.S.C. § 523(a)(2)(A), as demonstrated by both parties' opening statements, submitted evidence, and post-trial briefs. Consequently, the Court will make a determination based upon section 523(a)(2)(A).

The account agreement between the Debtor and AmEx states that full payment of the charges is due upon receipt of the monthly billing statement, with the exception of the "Sign and Travel" portion of the account, for which a minimum monthly payment is due. The Debtor's account remained in good standing until he incurred the charges at issue in this proceeding. These charges were made on the regular portion of the account and payment was due upon receipt of the monthly statement. At trial, the Debtor stated he was aware that full payment of the charges was due each month.

The Debtor is a single male currently employed by Domino's Pizza as a deliveryman, a job he has held for approximately ten years. Federal Income Tax returns submitted as evidence demonstrate that the Debtor reported an average gross monthly income of $707.97 for the years 1997–99. The Debtor's Schedule I of his bankruptcy petition lists his gross monthly income as $939.16. At trial, the Debtor accounted for the discrepancy between the two gross income figures by stating that tips he earns as a deliveryman represent the difference. The Debtor's monthly expenses as listed on Schedule J are $1256.49. The deficit between his net earnings and fixed expenses is $398.99 a month.

Unsecured nonpriority debts listed on Schedule F reflect that the Debtor owes approximately $89,000.00 on 19 credit cards and one line-of-credit account. The Debtor admitted at trial that the minimum payments on his credit cards may have exceeded $2000.00 a month prior to bankruptcy. The Debtor testified that he accumulated most of the credit card debt within the last three years. Facts in the record imply that the Debtor became more dependant upon the cards for living expenses after his separation and divorce

from his wife four years ago. He stated that since August 1999, he has occasionally drawn cash advances from one credit card to pay another credit card account. The Debtor explained that he was able to keep his accounts in good standing during the past two years because his girlfriend, with whom he shared a home, paid $400.00 to $500.00 in joint living expenses until mid-January 2000 when she returned to her native country of Brazil.

In addition to the departure of his girlfriend, the Debtor stated that increased medical bills and health insurance costs resulting from his diabetic condition diagnosed in 1999 contributed to his financial decline. He also testified that a decrease in his work hours and the failure of his employer to pay an anticipated bonus of $1000.00 in December 1999 were adverse circumstances leading to bankruptcy. Despite these circumstances, the Debtor testified that he planned to repay AmEx for the charges at issue by borrowing the money from his former spouse, but her help was not forthcoming. He also stated that he planned to supplement his income with yard work.[2]

AmEx presented evidence that, in addition to the lawn equipment purchases, the Debtor used his AmEx card 45 times between December 18, 1999 and February 17, 2000. The evidence shows that 18 of those charges were incurred for dining at area restaurants for a total of $450.38, including a single charge for $88.10 at Restaurante Botin and another for $46.00 at La Mariscada Restaurant. (Pl.'s Ex. 5.) On at least two occasions, the Debtor appears to have charged two meals in a single day. During the same two-month period, the Debtor used his AmEx card 13 times to purchase clothing and accessories costing $1823.62. The lawn equipment, restaurant, and clothing store charges rep-

---

**2.** The Debtor used his AmEx card on February 15 and 17, 2000, to purchase $700.00 in landscaping equipment. However, the Debtor testified that the equipment was stolen two

months later, and it does not appear from the record that he used any supplemental earnings to repay the debt to AmEx while the equipment was still in his possession.

resent 79% of the purchases on the card during the two-month period.

The Debtor explained that he dined out frequently during the period because his girlfriend had left and he had no one to cook for him. He also stated that a few of the charges were for the purpose of sending food to Cuba to impoverished relatives. Likewise, the Debtor claimed that the clothing purchases were for his mother, father, ex-wife, and adult son living in Cuba, all of whom had had all of their clothing stolen. On his Statement of Financial Affairs, the Debtor listed no gifts to relatives aggregating more than $200.00.

Paul Carey, a custodian of records for AmEx, testified that the charges at issue represented a change in the Debtor's spending pattern. The Debtor's highest balance in the two years preceding bankruptcy was $923. Before January 2000, the Debtor averaged $300 to $400 in charges per statement period.

## DISCUSSION

The Bankruptcy Code provides that:

(a) a discharge under § 727 ... of this title does not discharge an individual from any debt—...

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A)(1994).

■ An exception to discharge for actual fraud must be proven by a preponderance of the evidence, and the burden is upon the creditor seeking the exception. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

■ To prove actual fraud, the creditor must establish the common law elements of fraud. These include:

(1) that the debtor made the representations;

(2) that at the time of those representations the debtor knew they were false;

(3) that he made them with the intention and purpose of deceiving the creditor;

(4) that the creditor relied on such representations; and

(5) that the creditor sustained the alleged loss and damage as the proximate result of the representations made.

*AT & T Universal Card Services Corp. v. Chinchilla (In re Chinchilla)*, 202 B.R. 1010, 1013–14 (Bankr.S.D.Fla.1996) (citing *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995); *Anastas v. American Savs. Bank (In re Anastas)*, 94 F.3d 1280, 1283 (9th Cir.1996)).

■ The purchase of goods with a credit card constitutes an implied representation by the purchaser that he has both the means and the intent to repay the obligation due to the credit card issuer who extends credit. *First Card Servs. v. Cruz (In re Cruz)*, 179 B.R. 975, 977 (Bankr.S.D.Fla.1995) (citing *In re Schmidt*, 36 B.R. 459 (E.D.Mo.1983); *In re Kramer*, 38 B.R. 80 (Bankr.W.D.La.1984); *In re Ciavarelli*, 16 B.R. 369 (Bankr. E.D.Pa.1982)). A card holder incurring charges without an intent to repay knowingly makes a false representation in order to deceive the card issuer. *Anastas v. American Savs. Bank (In re Anastas)*, 94 F.3d 1280, 1285 (9th Cir.1996); *La Capitol Fed. Credit Union v. Melancon (In re Melancon)*, 223 B.R. 300, 319 (Bankr. M.D.La.1998).

■ Objective or circumstantial factors indicative of intent include the following:

1. Length of time between the charges and the filing of the petition;

2. Whether an attorney was consulted regarding bankruptcy before the charges were made;

3. The number of charges made;

4. The amount of the charges;

5. The financial condition of the debtor at the time the charges are made;

6. Whether the debtor made multiple charges on the same day;

7. Whether or not the debtor was employed;

8. The debtor's prospects for employment;

9. The debtor's financial sophistication;

10. Whether there was a sudden change in the debtor's buying habits; and

11. Whether the purchases were made for luxuries or necessities.

*AT & T Universal Card Services Corp. v. Stansel (In re Stansel)*, 203 B.R. 339, 343 (Bankr.M.D.Fla.1996) (citing *Household Credit Serv. v. Rivera (In re Rivera)*, 151 B.R. 602, 605 (Bankr.M.D.Fla.1993); *Manufacturers Hanover Trust Co. v. Abercrombie (In re Abercrombie)*, 148 B.R. 964, 966 (Bankr.M.D.Fla.1992)); *AT & T Universal Card Services Corp. v. Chinchilla (In re Chinchilla)*, 202 B.R. 1010, 1014 (Bankr.S.D.Fla.1996) (citing *Citibank South Dakota v. Dougherty*, 84 B.R. 653, 657 (9th Cir. BAP 1988)); *First Card Servs, Inc. v. Cruz (In re Cruz)*, 179 B.R. 975, 977 (Bankr.S.D.Fla.1995) (citing *In re Faulk*, 69 B.R. 743 (Bankr.N.D.Ind.1986)).

■ Addressing the first three elements of actual fraud, the Court finds that the Debtor made a representation of an intent to repay AmEx each time he used his AmEx card within the relevant period. If the Debtor actually lacked the intent to repay the charges, his representation was intentionally false such that the second and third elements of the analysis will be established. Therefore, the applicable circumstantial factors indicative of intent will be examined in light of the record before the Court.

As to the first and second circumstantial factors, the record reveals that 39 days intervened between the filing of the petition on March 27 and the date of the last charge and that nearly half of the 47 charges occurred within a 17–day period in February. The evidence also shows that the Debtor retained his bankruptcy attorney on March 20, demonstrating that the Debtor intended to file for bankruptcy on a date even earlier than the petition date. The close proximity in time of the Debtor's engagement of an attorney and the petition date to the January–February charges supports an inference of lack of intent to repay. Thus, the timing of the Debtor's resort to bankruptcy weighs in favor of finding lack of intent to pay, despite the fact that the Debtor made no charges after he visited his attorney.

The third factor also indicates a lack of intent to pay in that the Debtor used his card excessively on nonessential items at a time when he claims that his wages were reduced and his fixed living expenses increased. During the relevant period, the Debtor charged on his AmEx card 47 times with the majority of the charges made to purchase meals in restaurants or to buy clothing and accessories. As to the fourth factor, the Debtor's charges were generally less than $100.00. However, he made major lawn equipment purchases totaling $700.00 and numerous clothing purchases that included several single charges in excess of $200.00. This factor is indicative of lack of intent to pay.

The Debtor's financial condition at the time the charges were made, the fifth factor, strongly supports a finding of lack of intent to repay the charges owed to AmEx. The Debtor's schedules reveal that the Debtor was grossing $939.16 in income and that his expenses exceeded his income by $398.99. Before bankruptcy and during the relevant period, the Debtor's expenses would also have included approximately $2000.00 in minimum credit card payments due on nineteen different accounts.

The Debtor blamed his inability to repay when the charges were due on unforeseen circumstances such as increased health insurance costs, decreased wages, the departure of his girlfriend, and the bonus that never materialized. However, the fact is that each circumstance had manifested it-

self before the Debtor's excessive charges from mid-January to mid-February. Furthermore, even if these circumstances had not worked against him, the Debtor still could not have made the minimum payments on the $89,000.00 credit card debt he had accumulated. By his own admission, the Debtor took cash advances from one account to pay another, although the record does not reflect how frequently he engaged in this practice. All things considered, the Court concludes that the Debtor did not have the ability to repay the AmEx debts at the time he incurred them.

The sixth factor, whether multiple charges were incurred on a single day, also suggests lack of intent to repay. On eleven separate days in a two-month period, the Debtor charged from two to four times on his AmEx card. Like the excessive number and amount of charges discussed above, multiple charges on a single day are sometimes characteristic of individuals who "load up" their credit cards in anticipation of bankruptcy.

On the other hand, the seventh factor, whether the Debtor was employed at the time, supports an inference that the Debtor had the ability and, therefore, the intent to repay the charges. This factor does not weigh strongly in the Debtor's favor, however, because the Debtor's wages as a pizza deliveryman are very low.

The eighth factor, the Debtor's prospects for employment, indicates lack of intent to pay. The Debtor testified that his work hours decreased in October 1999 but that he was promised that his hours would later be increased, and thus he held prospects for greater earnings during the relevant two-month period. Tax returns and bankruptcy schedules submitted as evidence demonstrate a consistent income over the three years preceding bankruptcy and show that the Debtor did earn slightly more money at the time of his bankruptcy filing, with reduced hours, than during the preceding year when he was allegedly working full time. However, the evidence does not show that during the two-month period the Debtor held a reasonable expectation of significant income increases that would be necessary to meet his monthly expenses.

The ninth factor, the financial sophistication of the debtor, supports the Debtor's contention that he intended to repay the charges when he made them. The Debtor's native language is Spanish, and he used an interpreter in order to testify. The Debtor stated that he can speak some English but that he does not read English well. Despite the language barrier, it is apparent the Debtor understands the importance of fundamental financial responsibilities such as filing tax returns and paying his bills on time. The Debtor testified that he understood his agreement with AmEx was that his obligation for charges was to be paid in full each month. Moreover, the Debtor has lived in this country for more than 16 years and has been gainfully employed during that period. Presumably, the Debtor's delivery job requires a driver's license, so he can read at least some English. Because of these facts, the Debtor's lack of financial sophistication weighs only slightly in favor of a finding of intent to repay.

The tenth factor, a sudden change in buying habits, was established by the evidence. In the two years preceding bankruptcy, the Debtor's highest balance due to AmEx was $943.00. Excluding January and February 2000, the Debtor's average monthly charges were $300.00 to $400.00. In comparison, the charges and late fees for the two-month period in question averaged $1872.00 This increased activity strongly supports the inference that the Debtor was "loading up" before bankruptcy.

The eleventh factor, whether the purchases were for luxuries or necessities, is the most damaging in terms of demonstrating the Debtor's lack of intent to repay. During the period in question, the Debtor dined at restaurants 18 times,

charging $450.38 in food and beverage costs. The Debtor defended this expensive practice by stating that he was forced to dine out when his girlfriend was no longer available to prepare meals. However, a number of the charges were posted prior to the time the girlfriend reportedly departed for Brazil. Furthermore, there was no reason the Debtor could not prepare simple meals at home or consume less expensive meals at restaurants consistent with his available income and not at the expense of AmEx. The Debtor also stated that a few of the restaurant charges were to provide food to relatives in Cuba. However, this testimony is not credible absent some corroborating evidence.

The Debtor also used his AmEx card to purchase clothing and accessories totaling $1823.62, approximately half of the total charges at issue. The Debtor's explanation that these purchases were for his adult relatives in Cuba is not credible for several reasons. He could not document his having transported the clothing to that country, and he did not list these gifts as required by his Statement of Financial Affairs. Furthermore, some of the apparel was children's clothing. Other apparel store charges included the purchase of watches and sporting goods, not clothing, as generally itemized in Plaintiff's Exhibit Five. Even if the Debtor's story were true, it would be inappropriate to purchase such quantities of new clothing as gifts, given his financial condition when the charges were made. The restaurant meals, clothing, and liquor store charges of $88.76 clearly cannot be characterized as necessities. His use of his AmEx card for such nonessential items suggests the type of bad faith that supports a finding of lack of intent to pay.

In summary, nine of the eleven factors considered weigh toward a finding of fraudulent intent not to repay the charges. Thus, the Court infers the Debtor intended to deceive AmEx with false representations which he knowingly made.

In addition to proving the debtor's knowing misrepresentation with intent to deceive, the creditor must prove that it justifiably relied upon the false representation and sustained loss as a result. Reliance is established when use of the credit card by the debtor causes the card issuer to act on its guarantee of payment to the merchant. *Citicorp Credit Servs., Inc. v. Hinman (In re Hinman)*, 120 B.R. 1018, 1022 (Bankr.D.N.D.1990); *Ohio Citizens Bank v. Satterfield (In re Satterfield)*, 25 B.R. 554, 560–61 (Bankr.N.D.Ohio 1982).

Reliance must be justifiable, a subjective standard based on the qualities and characteristics of the particular plaintiff and surrounding circumstances of the case. *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) (quoting Restatement (second) of Torts (1976) § 545A, cmt. b (1976)). Reliance on a representation without conducting an investigation is justified as long as the falsity of the representation would not be apparent upon cursory examination. *Field*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (quoting W. Prosser, Law of Torts § 108, p. 718 (4th ed.1971)).

In the instant case, AmEx has established that it relied upon the Debtor's misrepresentations by paying the various merchants for each of the Debtor's charges during the two-month period. Such reliance was justified, the creditor having investigated the Debtor before extending credit and the Debtor having maintained the account in good standing for sixteen years. By the time AmEx was aware the Debtor had not paid his February bill, the Debtor had already charged on his card 47 times without intent to pay. AmEx incurred damages by paying for the Debtor's purchases from December 18, 1999, to February 17, 2000.

## CONCLUSION

AmEx has established by preponderance of the evidence that the Debtor's obligation in the amount of $3751.93 was in-

curred through actual fraud. Therefore, the debt is exempted from discharge pursuant to section 523(a)(2)(A) of the Bankruptcy Code. The Court will enter a separate judgment consistent with these findings of fact and conclusions of law.